COMMONWEALTH of Pennsylvania,
Appellee,

v.

Ronald Winston LEWIS, Appellant.

Superior Court of Pennsylvania.

Submitted Oct. 1, 2001.

Filed Feb. 8, 2002.

Scott D. Galloway, Media, for appellant.

Michelle P. Hutton, Asst. Dist. Atty., Media, for Commonwealth, appellee.

Before CAVANAUGH, J., FORD ELLIOTT, J., and CERCONE, President Judge Emeritus.

CERCONE, President Judge Emeritus.

¶ 1 Appellant, Ronald Lewis, appeals from the judgment of sentence of twelve and one-half (12–1/2) to twenty-five (25) years incarceration imposed by the Trial Court after he entered a plea of *nolo contendere* to the charge of third degree murder. After review, we affirm.

¶ 2 The underlying factual history of this case has been taken from the affidavit of probable cause in support of Appellant's arrest and the Trial Court Opinion. It is as follows:

> [The infant victim in this case,] Shirron Lewis [,] was born prematurely at 26½ weeks on September 27, 1997, suffering from severe respiratory distress syndrome and sepsis. The child weighed 1 pound 9 ounces at birth. He remained hospitalized for three (3) months. His weight at discharge was 5 pounds 12 ounces. (Autopsy Report, [Commonwealth's Exhibit 1], p. 4).
>
> The child was discharged on December 27, 1997, and thereafter resided with his parents, the [A]ppellant and Jackie Allen. The child was required to be connected to an apnea/bradycar[d]ia monitor due to clinical apnea (temporary cessation of breathing) as well as signifi-

cant gastroespohageal reflux. The purpose of the monitor was to detect and monitor the child's pauses in breathing and heart rate. The monitor is known as a "smart" monitor, and is capable of recording events and setting off an alarm. The monitor was set to detect pauses in breathing that were 16 seconds or more, and to alarm if the pauses in breathing were more than 20 seconds. The monitor was set to record and alarm if the child's heart rate fell below 80 beats per minute. (Letter dated May 14, 1998, prepared by Russell Clayton, Sr. D.O.)

> The child was hospitalized from January 8, 1998 to January 21, 1998, and from January 26, 1998 to February 12, 1998 due to frequent monitor alarms.

Trial Court Opinion, filed 6/8/2001, at 3.

[In his statement given to police] [o]n March 2, 1998, [Appellant], stated [that morning] he got up ... changed Shirron's Pamper, fed him and laid Shirron in his swing. [Appellant] stated he, himself laid on the couch and watched T.V. [Appellant stated that] [a]round 1200 Hours [he] went across the street and asked Jamie (Jamyra Starkey) to bab[y]sit. [Appellant stated that] Jamie watched Shirron until 1300 hours. When [Appellant] returned, he told Jamie it's o.k. and to go home. After checking Shirron and the monitor, [Appellant] went to sleep at this time. [Appellant stated] [t]here were no problems indicated on the monitor, and Shirron was breathing.

[Appellant] stated the baby monitor activated and woke him up. [Appellant] stated he shook the bassinet and there was no response from Shirron. [Appellant] stated his wife returned and he called "911" [Appellant] stated he shook the bassinet, but not hard. He did not

see Shirron was breathing. No one else was in the house.

Affidavit of Probable Cause for Arrest, filed 2/23/2000.

[ ]Emergency Medical Services were dispatched at 1445 hours to the child's residence and arrived at 1451 hours. The child was bradycardic,[1] and there was no sign of spontaneous respiration. CPR was performed and the heart rate increased. The child was intubated. Emergency Medical Services left the residence with the child at 1457 hours and arrived at Crozer–Chester Medical Center at 1502 hours. The child was found to have sustained intracranial and subarachnoid hemorrhaging, retinal hemorrhaging behind both eyes, and a small abrasion on the left area of the forehead. The child was later found to have also sustained a metaphyseal fracture of the right tibia.

Since the smart monitor connected to the child was capable of recording events, a record of what transpired on March 2 was reviewed. The record of events was downloaded from the monitor and interpreted by Russell G. Clayton Sr., D.O. a pulmonologist at St. Christopher's Hospital for Children. Dr. Clayton interpreted the monitor download on or about March 6, 1998 and prepared a written report.

The download from the smart monitor confirmed that prior to March 2, 1998, there were 19 episodes of prolonged central apnea of 16 to 27 seconds in duration. There were no significant heart rate changes during these episodes.

Dr. Clayton's report of the monitor download for the events that transpired on March 2, 1998, is as follows:

On March 2 at 1223 hours, a decrease in heart rate from 200 to 50 beats per minute was recorded, coincident with an increase in chest wall amplitude. After hitting a low of 50, the heart rate gradually increased to 100 before the event recording terminated. At 1425, there was a 60–second apnea, and the heart rate decreased from 100 to sixty (60) beats per minute. From 1428 to 1434, 13 events showing single sign breaths interspersed between episodes of central apnea were recorded. Heart rate during these events ranged from 180 beats per minute at 1428 to 70 beats per minute at 1434. At 1435, there were many episodes of apnea with the heart rate ranging from 100 to 60 beats per minute. The last six events, occurring from 1438 to 1436, revealed background artifact. One of these events also revealed a heart rate of 40 beats per minute, and a separate event revealed a prolonged central apnea. The last recorded event revealed a heart rate varying between 40 and 10 beats per minute.

In November of 1998, Dr. Clayton reviewed the smart monitor download at the request of the police and rendered the following written opinion on November 3, 1998:

At 1223 on March 2, Shirron's body was forcefully manipulated. The low heart rate that occurs probably signifies the initial brain injury. (If a baby's brain is concussed, pressured, or contused, the heart will slow as a reflex). This forceful manipulation was not resuscitation, and resuscitation at this point would not have been necessary, since there was no preceding stoppage of breathing or slowing of heart rate.

---

1. Bradycardic means possessed of an abnormally slow heart rate. Dorland's Illustrated Medical Dictionary, 24th Edition at 217.

Over the next 2 hours, bleeding probably continued in the brain, along with brain swelling. When brain swelling and bleeding reached a point, Shirron stopped breathing and the heart rate slowed. This is represented by the 1424 event. The irregular chest wall movements may represent irregular respiratory gasps, or may be external chest wall manipulation. (CPR?)

Over the next ten minutes, Shirron exhibits long pauses in breathing punctuated by sighs. This breathing pattern is consistent with severe brain injury. Although the monitor alarmed for many of these events, no CPR is evident.

At 1435, CPR is tentatively started and occurs in earnest by 1446.

The child never recovered from his injuries. The child remained on life support in a persistent vegetative state until his death almost two (2) years later on January 3, 2000.

The autopsy was performed on January 4, 2000, and the cause of death was determined to be "Anoxic encephalopathy and the complications and consequences thereof; consistent with shaken baby impact syndrome." The manner of death was determined to be homicide. (Autopsy Report [Commonwealth's Exhibit 1, page 2.] ).

Trial Court Opinion, *supra,* at 3–5.

¶ 3 In early March of 1998, after the child was being treated at the hospital, Appellant was charged at that time with attempted homicide,[2] aggravated assault,[3] and related offenses. Upon the child's death in January of 2000, Appellant was additionally charged with murder of the first, second and third degree.[4] All charges were consolidated for trial purposes.

¶ 4 Trial was scheduled for October 31, 2000; however, on October 27, 2000 Appellant, represented by court appointed counsel, entered a negotiated plea of *nolo contendere* to the charge of murder in the third degree. After a colloquy hearing, the Trial Court sentenced Appellant to the term of incarceration called for by the plea agreement, specifically the aforementioned twelve and one-half (12–1/2) to twenty five (25) years incarceration.

¶ 5 On November 6, 2000 Appellant, represented by newly retained private counsel, filed a post sentence motion to withdraw the plea. Appellant asserted as the basis for the withdrawal of his plea an allegation that it was the baby's mother, his girlfriend, who had actually caused the injury to the baby by shaking him and throwing him down on the bed around eight (8) in the morning on March 2, 1998. The Trial Court held a hearing on this motion on December 12, 2000 and issued an order the next day denying the motion. This timely appeal followed.

¶ 6 In this appeal, Appellant presents one (1) question for our Court's consideration:

1. Whether or not the Trial Court was in error in denying [Appellant's] Post Sentence Motion requesting that he be allowed to withdraw his Nolo Contendere plea in that it was not knowingly, voluntarily and intelligently entered.

Appellant's Brief at 4.

¶ 7 "[I]n terms of its effect upon a case, a plea of nolo contendere is treated the same as a guilty plea." *Commonwealth v. Miller,* 748 A.2d 733, 735 (Pa.Super.2000) (citing *Commonwealth v. Boatwright,* 404 Pa.Super. 75, 590 A.2d 15, 19 (1991)). Thus, as with a guilty plea, in

---

**2.** 18 Pa.C.S.A. § 901 and § 2502.

**3.** 18 Pa.C.S.A. § 2702

**4.** 18 Pa.C.S.A. § 2502(a), (b) and (c) respectively.

order for a defendant to prevail on a post sentence motion to withdraw a plea of *nolo contendere,* requires that the defendant demonstrate manifest injustice. *Commonwealth v. Jefferson,* 777 A.2d 1104, 1107 (Pa.Super.2001). Manifest injustice can be shown if the defendant establishes that he or she did not tender the plea voluntarily. *Id.*

¶ 8 The relevant Rule of Criminal Procedure governing the proper requirements which must be met before a Trial Court can accept a plea of *nolo contendere,* Rule 590, provides as follows:

**Rule 590. Pleas and Plea Agreement.**

(A) GENERALLY.

(1) Pleas shall be taken in open court.

(2) A defendant may plead not guilty, guilty, or, with the consent of the judge, *nolo contendere.* If the defendant refuses to plead, the judge shall enter a plea of not guilty on the defendant's behalf.

(3) The judge may refuse to accept a plea of guilty or *nolo contendere,* and shall not accept it unless the judge determines after inquiry of the defendant that the plea is voluntarily and understandingly tendered. Such inquiry shall appear on the record.

(B) PLEA AGREEMENTS.

(1) When counsel for both sides have arrived at a plea agreement, they shall state on the record in open court, in the presence of the defendant, the terms of the agreement, unless the judge orders, for good cause shown and with the consent of the defendant, counsel for the defendant, and the attorney for the Commonwealth, that specific conditions in the agreement be placed on the record in camera and the record sealed.

(2) The judge shall conduct a separate inquiry of the defendant on the record to determine whether the defendant understands and voluntarily accepts the terms of the plea agreement on which the

guilty plea or plea of *nolo contendere* is based.

(C) MURDER CASES.

In cases in which the imposition of a sentence of death is not authorized, when a defendant enters a plea of guilty or *nolo contendere* to a charge of murder generally, the judge before whom the plea was entered shall alone determine the degree of guilt.

Pa.R.Crim.P. 590.

¶ 9 In order to ascertain whether a plea of *nolo contendere* has been tendered by a defendant knowingly and voluntarily, as required by this rule, requires that the trial judge inquire at a minimum into the following six (6) areas:

(1) Does the defendant understand the nature of the charges to which he or she is pleading guilty or *nolo contendere?*

(2) Is there a factual basis for the plea?

(3) Does the defendant understand that he or she has the right to trial by jury?

(4) Does the defendant understand that he or she is presumed innocent until found guilty?

(5) Is the defendant aware of the permissible range of sentences and/or fines for the offenses charged?

(6) Is the defendant aware that the judge is not bound by the terms of any plea agreement tendered unless the judge accepts such agreement?

Pa.R.Crim.P. 590, Comment; *Jefferson, supra,* 777 A.2d at 1107. Additionally, "when a plea of nolo contendere includes a plea agreement, the judge must conduct a separate inquiry on the record to determine whether the defendant understands and accepts the terms of the plea agreement." *Id.* at 1107–1108; Pa.R.Crim.P. 590(B)(2). In determining whether a plea was voluntarily entered into, an examination of the totality of the circumstances is warranted. *Commonwealth v. Allen,* 557

Pa. 135, 146, 732 A.2d 582, 588–589 (1999). "When reviewing a trial court's denial of a motion to withdraw a plea of [nolo contendere], we will not disturb the court's decision absent an abuse of discretion." *Miller, supra,* 748 A.2d at 735.

■ ¶ 10 Prior to the plea hearing, Appellant, who was forty-four (44) years of age and a college graduate, reviewed a written plea colloquy with his attorney, answered each of the questions in the colloquy, initialed his answers, and signed the colloquy at the end. At the plea hearing, Appellant's attorney questioned Appellant in the presence of the Trial Judge as to each of the answers which he had given to the questions in the written plea colloquy. This questioning establishes clearly that Appellant was aware of the nature of the charges to which he was pleading *nolo contendere,* specifically murder of the third degree. N.T. Plea Hearing, 10/27/2000, at 11. It shows that Appellant was aware of his right to proceed to a trial in front of a jury of his peers. *Id.* at 8–10. It demonstrates that Appellant was aware of the fact that he was presumed innocent and that the Commonwealth was required to prove him guilty beyond a reasonable doubt. *Id.* at 9. It also shows that Appellant knew the permissible range of sentences and fines which could be imposed for this offense. *Id.* at 11. Appellant also indicated that he understood the specific negotiated terms of the plea agreement, namely that he would receive a sentence of twelve and one-half (12–1/2) to twenty-five (25) years incarceration in exchange for his plea. *Id.*

¶ 11 The Trial Court then conducted its own independent inquiry of Appellant. The Court proceeded as follows:

Mr. Lewis, as Ms. Courtney has told you and as you've been—as far as the previous issue and nobody can force you to plead guilty to any charge if you don't wish—or to plead *nolo contendere.* Excuse me. If you do not wish to enter a plea of *nolo contendere,* you don't have to. You can, instead, elect to exercise your right to a trial and proceed with trial next week. If you did elect to exercise that right, then it would be the Commonwealth's burden to prove the charges against you beyond a reasonable doubt. In Information A of Transcript 170 of 2000, the charge of murder is presented in the first, second and third degree. However, you've indicated to plead *nolo contendere* to Murder in the Third Degree. And that would mean if you elected to have a trial in that particular charge, it would be the Commonwealth's burden to prove beyond a reasonable doubt that on or about March 2, 1998, while you were in Delaware County and you did with legal malice cause without specific intent, unlawfully inflict a mortal wound upon Sheron [ph] (sic) Lewis, which caused the death of Sheron (sic) on January 3, 2000. Is that the extent, sir, to which you wish to enter a plea of *nolo contendere* today as you understand it?

[The Appellant]: Yes.

[The Court]: All right. Mr. Lewis, I'm going to hand up Information A and ask that you sign it, indicating your intent to enter a plea of *nolo contendere* to the charge of Third Degree Murder.

[Whereupon the {Appellant} signed the information]

*Id.* at 17–18.

¶ 12 A factual basis for the plea was then established via the entry into evidence at the plea hearing the affidavit of probable cause for Appellant's arrest. This affidavit, in its entirety, set forth all the relevant facts surrounding the circumstances of Shirron's death, in substantially the same manner as we have previously recounted at the beginning of this memorandum. The Commonwealth also entered

into evidence the expert report of forensic pathologist Dr. Constance DiAngelo. Dr. DiAngelo had reviewed the medical records of Shirron and the related reports of a radiologist, pulmonologist and neuropathologist regarding the nature of the injuries Shirron had suffered. Dr. DiAngelo concluded, based on her review, that Shirron died as the result of brain injuries which were consistent with "shaken baby/impact syndrome." Commonwealth's Exhibit 1, Autopsy Report, at 2. She opined that the cause of death was homicide. Appellant stipulated to the facts as set forth in the affidavit of probable cause and the expert's report. N.T. Plea Hearing, *supra*, at 19–20.

¶ 13 Thus, our review of the certified record of the plea hearing conducted in this matter indicates that the requisite inquiry was made into each of the six (6) areas delineated by the comment to Pa. R.Crim.P. 590, and, also, proper inquiry was made as to whether the Appellant understood and accepted the specific terms of the plea agreement. Consequently, the record establishes that Appellant entered his plea of *nolo contendere* knowingly and voluntarily.

¶ 14 In spite of Appellant's express answers which he gave in his written colloquy, that indicated that he was proceeding voluntarily and of his own free will, and which he later reaffirmed orally to the Trial Court at the plea hearing, Appellant nevertheless now claims that he was pressured into accepting the plea agreement. The record, however, belies Appellant's assertion. At the outset of the plea hearing, Appellant acknowledged in open court that the Trial Court had given him and his attorney two (2) hours to discuss the plea offer that had been made. N.T. Plea Hearing, *supra*, at 6. Appellant acknowledged that he also had time to discuss the offer with both his girlfriend (the baby's mother) and also with his mother. *Id.*

Later in the plea hearing, Appellant also affirmatively indicated that he had not been pressured or coerced into accepting the plea and also that he had enough time to fully discuss his case and his decision to plead nolo contendere. *Id.*

¶ 15 At the hearing on his motion to withdraw the plea, Appellant acknowledged that it was he who authorized his counsel to explore the possibility of a plea arrangement in the week immediately prior to his plea. N.T. Plea Withdrawal Hearing, 12/12/2000, at 46. When counsel presented the plea agreement to him on the morning of October 27, 2000, he requested that his counsel allow him the opportunity to discuss the plea agreement with his mother and his girlfriend alone in his cell. *Id.* at 47. Counsel promptly arranged the meeting, which was permitted to take place in Appellant's cell without the presence of sheriff's deputies or guards. Appellant acknowledged that counsel went over each of the statements on the plea colloquy with counsel and initialed each paragraph. *Id.* at 53–54. Appellant also acknowledged that he was told that the sentence proposed by the District Attorney was as low as the District Attorney was willing to go. Appellant conceded that he understood that the effect of his plea would be that he would be convicted and sentenced to the term of incarceration called for in the plea, twelve and one half (12–1/2) to twenty-five (25) years incarceration. *Id.* at 63. Under these circumstances, it is clear then that Appellant contemplated the entry of a plea prior to October 27th and authorized his counsel to seek such an agreement. This was, therefore, not something that was sprung upon him at the "last second." Once the exact terms of the plea agreement were set, Appellant had ample time to discuss the deal alone with his Mother and his girlfriend and to consider its ramifications. It is evident that he understood what would

happen when he entered his plea. He cannot now fairly claim to have been unduly pressured, nor can he credibly deny his prior assertions made under oath and in open court that he was entering the plea of his own volition. *See e.g. Commonwealth v. Myers,* 434 Pa.Super. 221, 642 A.2d 1103, 1107 (1994) ("The mere fact that a defendant was 'under pressure' at the time he entered a guilty plea will not invalidate the plea, absent proof that he was incompetent at the time the plea was entered.") The record amply demonstrates Appellant's competence and knowledge of his actions at the time he entered his plea.

■ ¶ 16 Lastly, Appellant asserted that the Trial Court should not have accepted the plea since he indicated at the plea hearing that he was innocent. The statement Appellant is referring to was made at the end of the hearing after the Court had pronounced sentence. The following exchange transpired at that time:

[The Court] Do you have any questions about any of the terms of sentence.

[Appellant]: No.

[The Court]: At this time, do you have any questions that you would like to ask either [your counsel] or myself about any Post–Sentence Rights that you earlier reviewed with her and had an opportunity to read about on the written form?

[A.] No.

[The Court]: Do you have any other questions today, sir? Anything else that you would like to state?

[A.] No. Just that I'm innocent. But I'll ...

N.T. Plea Hearing, *supra,* at 23.

¶ 17 At that point counsel for Appellant asked the Court whether it would be willing to marry the Appellant and his girlfriend as Appellant had previously requested. The Court indicated that it would be willing to do so. *Id.* at 24. After a discussion as to whether Appellant could serve his sentence in a facility in his home county, the Court again asked Appellant if he had any questions and Appellant said no; whereupon the hearing was concluded. *Id.* at 27.

■ ¶ 18 Appellant's brief and unrepeated bald assertion of innocence made after he was sentenced does not, in and of itself, render the plea of *nolo contendere* involuntary or unknowing. In the first place a plea of *nolo contendere* does not, by its very nature, require the pleading defendant to concede his or her guilt. As the United States Supreme Court has held, a plea of nolo contendere is "a plea by which a defendant does not expressly admit his guilt, but nonetheless waives his right to a trial and authorizes the court for purposes of sentencing to treat him as if he were guilty." *North Carolina v. Alford,* 400 U.S. 25, 36, 91 S.Ct. 160, 167, 27 L.Ed.2d 162, 170 (1970). The Supreme Court further noted in *Alford* that "[T]he Constitution does not bar imposition of a prison sentence upon an accused who is unwilling expressly to admit his guilt but who, faced with grim alternatives, is willing to waive his trial and accept the sentence." *Id.* at 36, 91 S.Ct. at 167, 27 L.Ed.2d at 171. *Accord Commonwealth v. Boyd,* 221 Pa.Super. 371, 292 A.2d 434 (1972).

¶ 19 In the case at bar, Appellant was indeed facing a grim alternative when he elected to plead *nolo* contendere. He was charged with first and second degree murder. He knew that he could potentially face a term of life imprisonment if convicted. Thus, he elected to take the negotiated plea that offered a fixed determinate term of sentence, which was far less than life imprisonment. Indeed, Appellant conceded as much at the hearing on his request to withdraw his plea:

[Commonwealth]: Mr. Lewis, [your defense attorney] brought you an offer

from the Commonwealth, that was better than life in prison, correct?

A. Correct.

Q. And you chose to accept that offer, because it was better than possibly being convicted and doing life, correct?

A. Correct.

Q. And you made a voluntary and conscious decision to accept that offer because of the alternative, because you could have done life. Is that correct?

A. Correct.

N.T. Plea Withdrawal Hearing, *supra*, at 61–62.

¶ 20 As our Court has noted:

The desire of an accused to benefit from a plea bargain which he requests his counsel to arrange has been viewed as a strong indicator of the voluntariness of the plea. Just as a defendant may decide, as a matter of strategy or expedience, to voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime so also may a defendant, as a matter of expedience, decide to accept a plea bargain offer solely to reap some benefit from the sentence recommendation reiterated to the judge at the time of the entry of the plea.

*Myers, supra,* at 1106–1107 (quoting *Commonwealth v. Shaffer,* 498 Pa. 342, 352–353, 446 A.2d 591, 596 (1982)) (internal citations and quotations omitted).

¶ 21 Since the record in this matter establishes that Appellant knowingly and voluntarily entered into a negotiated plea agreement in the death of Shirron Lewis, and since Appellant received exactly the sentence which was called for by the terms

of that agreement, we hereby affirm his judgment of sentence.

¶ 22 Judgment of sentence affirmed.