J-S52008-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| JOHN LEWIS GERHOLT, SR., | |
| Appellant | No. 1622 WDA 2014 |

Appeal from the PCRA Order August 29, 2014
In the Court of Common Pleas of Bedford County
Criminal Division at No(s): CP-05-CR-0000530-2008

BEFORE:  SHOGAN, OLSON, and WECHT, JJ.

MEMORANDUM BY SHOGAN, J.:　　　　　**FILED SEPTEMBER 30, 2015**

Appellant, John Lewis Gerholt, Sr., appeals from the August 29, 2014 order denying his petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546.  After careful review, we affirm.

On August 21, 2012, facing charges of first-degree murder for the killing of his twenty-four-year-old wife, Karen Gerholt, along with the Commonwealth's intent to seek the death penalty, Appellant pleaded no contest to first-degree murder.  The Commonwealth summarized the facts of the crime at the plea hearing, as follows:

> [THE COMMONWEALTH]:　　Yes, Your Honor.　　Sunday, November 9th, 2008, Pennsylvania State Police received a dispatch to the proximity of Walmart parking lot in Snake Spring Township for the—to respond to a shooting.  Trooper John Brown of the Pennsylvania State Police was the first to arrive on scene. Upon his arrival, he observed [Appellant] kneeling down over the victim in this case, Karen M. Gerholt, age 24.  The victim was

lying on her back in the northeast corner of the parking lot. There was a gunshot—there was a shotgun laying beside the victim, and she had what appeared to be injuries to her abdomen, her back.

[Appellant] was taken into custody and returned to the station. They also recovered three 12-gauge shotgun shells in his right front pocket. At that point, Trooper Terry Summers of the Pennsylvania State Police was assigned to conduct an investigation into what happened that day.

During his investigation, we learned that between October 31st and November 7th, prior to this incident, [Appellant] told an acquaintance, George Cramer, on at least three or four occasions that he was going to, quote, kill that bitch, end quote, referring to the victim. On the morning of the incident, on November 9th, 2008, [Appellant] asked several people who would testify at trial where he could obtain a shotgun. At approximately 3:00 p.m. on November 9th, 2008, [Appellant] arrived at the Bedford Walmart store in his pickup truck. He purchased a hacksaw from the store paying in cash and quickly took the hacksaw from the store without a bag. [Appellant] took the hacksaw to his parked truck where he stayed for approximately six minutes. He then walked to a trashcan and threw away one bag containing what appeared to be a long, thin item. Police believe that item to be the barrel to that shotgun.

[Appellant] then moved his vehicle to several different parking locations within the Walmart Plaza. After moving the vehicle around for approximately 11 minutes, he walked across the Walmart parking lot into the McDonald's parking lot around the Tractor Supply building and back near the McDonald's parking lot. [Appellant] then walked around this area. This walk that I just described, Your Honor, took approximately 6 minutes.

[Appellant] then walked back to the Walmart parking lot hiding behind a large storage container and peering around the container to look at the McDonald's store. After hiding behind the storage container for approximately one minute, he returned to his vehicle. He then parked his vehicle behind the storage container in the Walmart parking lot, exited his vehicle, again peered around the container toward the McDonald's store, and walked into the McDonald's parking lot where he first came in contact with the victim.

- 2 -

From the time [Appellant] first arrived in the Walmart plaza, [Appellant] spent between 30 and 40 minutes walking around the plaza, McDonald's, and the Tractor Supply store. When [Appellant] last approached the Walmart parking lot, he was armed with a sawed-off, single-barrel, break-action shotgun and several shotgun shells. Several witnesses, who would be called to testify at trial, saw [Appellant's] actions during the shooting. And while some witnesses saw more than others, the investigation determined that they will all testify to the same general account.

[Appellant] approached the victim, Karen M. Gerholt, in the McDonald's parking lot. While the victim was running to her vehicle in the parking lot, [Appellant] fired the shotgun at her. [Appellant] then reloaded the shotgun and fired a second shot at the victim at very close range. The victim sustained a fatal gunshot wound which entered her back just below her left shoulder blade. The victim bled profusely from her midsection and mouth and was pronounced dead at the scene.

During the autopsy, at least 29 shotgun pellets were removed from the victim's body. And a plastic shotgun shell was located between the victim's heart and spine. Injuries from the shotgun blast were present on the victim's right lung, heart, left lung, and liver. The nature of the entry wound indicated that the shotgun was fired from a distance of three feet or less, and the Commonwealth would present testimony to support that at trial.

Shortly after shooting the victim, [Appellant] called the victim's stepmother, Bess Lemin, with the victim's cell phone, and told Lemin that he accidentally shot the victim. Ms. Lemin responded by saying that [Appellant] better not have injured the victim to which [Appellant] replied, quote, fuck you, end quote.

When investigators from the Pennsylvania State Police arrived, they found at least six live shotgun shells and one shotgun shell wadding various places in the parking lot, one live shotgun shell in [Appellant's] pants pocket, and one spent shotgun shell in the storm grate behind the victim's vehicle. Investigators found the sawed-off, single-barrel shotgun lying beside [Appellant] with the action open and one spent shotgun shell still inside. The barrel of the shotgun appeared to have been recently cut. After investigators located [Appellant], he

told them that he accidentally shot the victim and he was only there to scare her. The victim just—[Appellant] indicated the weapon went off while he was holding it.

A search of [Appellant's] vehicle revealed the following: A hacksaw that appeared to be brand new but had areas on pant [sic] worn off from the use; a greeting card addressed from [Appellant] to the victim in this case, Karen Gerholt; a letter also addressed to the victim in this case from [Appellant]; sawdust, and metal shavings, and sandpaper, which appeared to have been recently used. [Appellant] was Mirandized and chose not to speak to the police. However, he did make several statements during the process including the ones I've already stated, Your Honor, that he said it was an accident, things of that nature. In the police presence, when he observed a news report regarding the incident shortly after being taken into custody, [Appellant] stated that the victim's family should know what caused the incident because it was them, meaning the victim's family, that caused the accident.

An autopsy, Your Honor, was conducted at the Memorial Medical Center in Conemaugh by Dr. Mo Zhicheng and Dr. Manjunath Heggere, would indicate, Your Honor, that the victim died from a single shotgun wound to the right inferior scapula region, also described as her right lateral mid back. It was a fatal wound causing injuries to her visceral organs including her lungs, heart, and liver. That would be evidence that the Commonwealth would present at trial, Your Honor, to which we believe would support a conviction for Murder of the First Degree.

N.T. (Plea), 8/21/12, at 35–41.

The plea agreement provided for a "firm bargain for life imprisonment." Plea Agreement, 8/21/12, at ¶ 2. The trial court accepted the plea, which was entered during jury selection, and imposed a sentence of life in prison without the possibility of parole. Order, 8/21/12. Appellant did not file a direct appeal.

On October 29, 2012, Appellant filed both a purported *pro se* motion to withdraw his plea and a *pro se* PCRA petition. The PCRA court appointed counsel, who filed an amended petition on April 15, 2013. The trial court held hearings on January 15, 2014,[1] and March 25, 2014, and denied PCRA relief on August 29, 2014. Appellant filed a timely notice of appeal, and both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following issues on appeal:

I.   Whether the Trial Court properly concluded that appellant was provided effective assistance of counsel in entering his nolo contendere plea to the charge of Murder in the First Degree?

II.  Whether the trial court properly concluded appellant's plea was not unlawfully induced by either the District Attorney or his counsel, and the circumstances make it likely that he is innocent of the charge of Murder in the First Degree?

Appellant's Brief at 3.

When reviewing the propriety of an order denying PCRA relief, this Court is limited to determining whether the evidence of record supports the conclusions of the PCRA court and whether the ruling is free of legal error. **Commonwealth v. Perez**, 103 A.3d 344 (Pa. Super. 2014). We grant great deference to the PCRA court's findings that are supported in the record, **Commonwealth v. Rachak**, 62 A.3d 389 (Pa. Super. 2012), and

_____

[1] Both the Commonwealth and the trial court state the date of the hearing was January 14, 2014; we utilize the date stated on the transcript in the certified record, January 15, 2014.

will not disturb them unless they have no support in the certified record. *Commonwealth v. Lippert*, 85 A.3d 1095, 1100 (Pa. Super. 2014), *appeal denied*, 95 A.3d 277 (Pa. 2014).

In order to obtain collateral relief, a PCRA petitioner must establish by a preponderance of the evidence that his conviction or sentence resulted from one or more of the circumstances enumerated in 42 Pa.C.S. § 9543(a)(2). Instantly, Appellant asserted in his PCRA petition the existence of ineffective assistance of counsel pursuant to 42 Pa.C.S. § 9543(a)(2)(ii). A PCRA petitioner alleging ineffectiveness of his counsel will be granted relief only if he is able to prove that, "in the circumstances of [his] particular case," the truth-determining process was undermined to the extent "that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(ii). The law presumes that counsel was effective, *Commonwealth v. Montalvo*, 114 A.3d 401, 410 (Pa. 2015), and it is the petitioner's burden to prove the contrary. *Commonwealth v. Koehler*, 36 A.3d 121, at 132 (Pa. 2012). To plead and prove ineffective assistance of counsel a petitioner must establish: (1) that the underlying issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) actual prejudice resulted from counsel's act or failure to act. *Commonwealth v. Stewart*, 84 A.3d 701, 706 (Pa. Super. 2013) (*en banc*). A claim of ineffectiveness will be denied if the petitioner's evidence fails to meet any one of these prongs. *Commonwealth v.*

*Martin*, 5 A.3d 177, 183 (Pa. 2010). We have explained that trial counsel cannot be deemed ineffective for failing to pursue a meritless claim. *Commonwealth v. Loner*, 836 A.2d 125, 132 (Pa. Super. 2003) (*en banc*). Moreover, the PCRA court's credibility determinations, when supported by the record, are binding on this Court. *Commonwealth v. Spotz*, 18 A.3d 244, 259 (Pa. 2011).

We address the issues in tandem. Appellant contends that trial counsel[2] provided ineffective assistance of counsel in advising him to plead *nolo contendere*, maintaining that trial counsel did not advise him that entry of the plea would result in a life sentence without the possibility of parole. In conjunction, he maintains that because trial counsel failed to meet with him and were not prepared for trial, he was forced to accept the plea. Appellant's Brief at 6. He asserts that he "couldn't think straight," "was an emotional wreck," and was distracted and "not really paying attention." *Id*. at 8–10. He suggests that he was induced to plead guilty by promises that counsel would represent him in a custody matter following entry of the plea.

We note with disfavor that other than citing case law that refers to ineffective-assistance-of-counsel standards, Appellant fails to support his argument with citation to relevant law. The Pennsylvania Rules of Appellate

---

[2] Appellant was represented pretrial and during plea proceedings by Thomas M. Dickey, who practiced law for thirty years, and penalty phase counsel, David Beyer, who practiced law for sixteen years. N.T. (PCRA), 3/25/14, at 25, 118–119.

Procedure require adequate development of each issue raised with discussion of pertinent authority. ***Commonwealth v. Samuel***, 102 A.3d 1001, 1005 (Pa. Super. 2014); Pa.R.A.P. 2119. Nevertheless, we address Appellant's issues.

Allegations of ineffectiveness in connection with the entry of a guilty plea[3] will serve as a basis for relief only if the ineffectiveness caused the defendant to enter an involuntary or unknowing plea. ***Commonwealth v. Wah***, 42 A.3d 335, 338 (Pa. Super. 2012). "[T]he law does not require that [the appellant] be pleased with the outcome of his decision to enter a plea of guilty: All that is required is that his decision to plead guilty be knowingly, voluntarily, and intelligently made." ***Commonwealth v. Anderson***, 995 A.2d 1184, 1192 (Pa. Super. 2010). Moreover, with regard to the prejudice prong of the ineffectiveness standard, where an appellant has entered a guilty plea, he must demonstrate "it is reasonably probable that, but for counsel's errors, he would not have pleaded guilty and would have gone to trial." ***Commonwealth v. Timchak***, 69 A.3d 765, 770 (Pa. Super. 2013) (citing ***Commonwealth v. Rathfon***, 899 A.2d 365, 370 (Pa. Super. 2006)).

---

[3] "In terms of its effect upon a case, a plea of *nolo contendere* is treated the same as a guilty plea." ***Commonwealth v. Kepner***, 34 A.3d 162, 166 n.2 (Pa. Super. 2011) (citing ***Commonwealth v. Lewis,*** 791 A.2d 1227, 1230 (Pa. Super. 2002)).

The PCRA court determined that Appellant's claims are not supported in the record and therefore, lack arguable merit. PCRA Court Opinion, 9/3/14, at 17. We have reviewed the complete record, and we agree.

Appellant testified at the PCRA hearing that his counsel did not tell him that a life sentence meant "there was no parole," and "he wouldn't have signed nothing" if he had known that fact. N.T. (PCRA), 1/15/14, at 54. Appellant's assertion that trial counsel did not advise him that entry of the plea would result in a life sentence without the possibility of parole is belied by the record.

At the plea colloquy, Appellant stated that he reviewed the plea agreement "in its entirety" with his attorney and that he understood it. N.T. (Plea), 8/21/12, at 4. Appellant agreed that he reviewed the sentence recommendations of the plea agreement. *Id*. at 6. Appellant indicated his understanding of the plea court's explanations. *Id*. at 11. While Appellant acknowledged taking prescribed medication from his "psych doctor," he stated that it did not affect his ability to understand the proceedings. *Id.*

When the Commonwealth addressed the court about related matters, the prosecutor noted that the terms of the plea agreement "ensure[] that [Appellant] will be incarcerated for the remainder of his natural life." N.T. (Plea), 8/21/12, at 43. Appellant did not disagree or offer comment. *Id*. The prosecutor also explained its agreement "to take the death penalty off the table if [Appellant] entered a guilty plea." *Id*. at 44. At that point,

defense counsel stated, "I want to make sure [Appellant] is aware that a life sentence means without parole." *Id*. The plea court asked Appellant, "Do you understand that, Mr. Gerholt?" *Id*. Appellant replied, "Yes." *Id*. at 45.

Attorney Dickey testified that there was no indication that Appellant did not understand "what he was doing." N.T. (PCRA), 3/25/14, at 56. Counsel testified that he attempted to obtain the Commonwealth's agreement to a plea to third-degree murder, but "[t]hat just wasn't happening." *Id*. Regarding Appellant's claim that "nobody ever told [Appellant] he was entering a plea to First Degree Murder," Attorney Dickey testified, "That's simply not true." *Id*. Attorney Dickey offered extensive testimony regarding the explanations given to Appellant, and indicated that Appellant "absolutely" was told that the penalty for first-degree murder was life imprisonment without parole. *Id*. at 56–61. He further testified that it was Appellant's decision to plead to first-degree murder. *Id*. at 61. Regarding his preparedness for trial, Attorney Dickey testified that he was "absolutely" prepared to go to trial. N.T. (PCRA), 3/25/14, at 40, 84.

Attorney Dickey also testified regarding Appellant's implication, set forth in issue two, that his counsel made promises about separate legal matters "for the purpose of inducing him to enter the plea . . . ." Appellant's Brief at 13. PCRA counsel asked Attorney Dickey if he "ever promis[ed Appellant] that [he] would represent him in some sort of civil action to

provide title or whatever for these [grave] plots."[4]  N.T. (PCRA), 3/25/14, at 89.  Counsel responded:

> Well, not in relation to the plea.  What I said to [Appellant] was . . . . if you want, I will follow through with you.
>
> * * *
>
> I was waiting to hear from him.
>
> * * *
>
> [W]hen we left I told him once he got situated he needed to let me know what he wanted me to do with like this property and some stuff like that.  And I never heard any direction from that.

*Id*. at 90–91.  Attorney Dickey explained that he "was just basically trying to do that just as a courtesy to him because I had told him.  I was basically sticking to my word that I could do it for him before."  *Id*. at 91–92.  Appellant never contacted counsel about these matters.  *Id*. at 91.

Attorney Beyer's testimony was similar to that of Attorney Dickey.  Both men agreed that Appellant hoped to get a plea offer to third-degree murder, but he understood that he ultimately was facing the possibility of a first-degree murder conviction and the death penalty.  N.T. (PCRA), 3/25/14, at 120–122.  Attorney Beyer explained that Attorney Dickey was "very specific" with Appellant that "life without parole means life without

---

[4]  Appellant asserted that he wanted to visit the victim's grave, he wanted his children to visit him, and he had a civil matter relating to burial plots.  He implied that he entered a plea in order to gain Attorney Dickey's representation on these matters.  N.T. (PCRA), 1/15/14, at 26–28; Appellant's Brief at 12.

parole." *Id*. at 123. Attorney Beyer testified that during jury selection, when it was clear that there was no plea offer to third-degree murder, and the Commonwealth was not "budging" regarding removing the death penalty from "the table," Appellant began questioning the viability of a plea to first-degree murder to avoid the possibility of receiving the death penalty. *Id*. at 125. Attorney Beyer indicated that he was "ready to handle the death penalty phase," that he had "mitigation experts" hired, and that he had a "team" assembled and prepared if Appellant was convicted of first-degree murder. *Id*. at 126–127. Attorney Beyer also explained that in addition, he was "very involved in the guilt phase process" as well, reviewing strategies and evaluating the case. *Id*. at 127–128. When asked about Appellant's mental state and understanding of the proceedings and trial preparation, Attorney Beyer described Appellant as "very cognizant with me, very understanding. . . . I never, ever felt that he didn't understand what I was saying. He asked relevant questions, and he was very tuned in with what was going on." *Id*. at 128.

Our review of the record compels the conclusion that the PCRA court's finding that Appellant's claim of ineffective assistance of counsel lacks arguable merit is amply supported. The PCRA court explained that it did "not credit the contentions of [Appellant]" and found that they did not have arguable merit. PCRA Court Opinion, 9/3/14, at 7. Deferring to the PCRA court's credibility conclusions as we must, *Spotz*, 18 A.3d at 259, and

concluding that its conclusions are supported in the record, Appellant has failed to prove that his underlying claim has arguable merit. It is clear that while Appellant initially hoped to plead to third-degree murder, as the potentiality of the death penalty morphed into reality during jury selection, Appellant's focus shifted.[5] Appellant is not entitled to relief.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/30/2015

_____

[5] When asked at the PCRA hearing, if Appellant was "adamant that he didn't want to take life in prison, First Degree Murder, and then at jury selection and the next day" he decided to plead, "[w]hat changed?" Attorney Beyer explained:

> You know, it's not uncommon. A defense attorney will see it all the time. Once you start to pick a jury they're realizing at that point in time, my opinion anyway, that Third is not an option. That I'm really going through with this and maybe what my attorneys have been telling me for the past couple of years is true and maybe I am looking at the death penalty. I think that's—whenever those realities start setting in that's when they start really weighing their options, and I think that's what happened here in my opinion.

N.T. (PCRA), 3/25/14, at 125–126.