[J-59-2014]
IN THE SUPREME COURT OF PENNSYLVANIA
EASTERN DISTRICT

SAYLOR, C.J., EAKIN, BAER, TODD, STEVENS, JJ.

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 678 CAP |
| | : |
| Appellee | : Appeal from the order of the Court of |
| | : Common Pleas of York County, Criminal |
| | : Division, dated January 29, 2013 at No. |
| v. | : CP-67-CR-0000753-1999 |
| | : |
| | : SUBMITTED:  June 10, 2014 |
| NOEL MATOS MONTALVO, | : |
| | : |
| Appellant | : |

## OPINION

**MADAME JUSTICE TODD**                    **DECIDED:  April 27, 2015**

This is a capital appeal from the order of the Court of Common Pleas of York County denying Appellant Noel Matos Montalvo's petition for relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546.   For the reasons that follow, we are constrained to vacate the order and remand this matter to the PCRA court for further proceedings, as discussed below.

### I. Factual and procedural background

Appellant is the brother of Milton Montalvo ("Milton").  In 1995, Milton and his common law wife, Miriam Ascencio ("Miriam"), moved from Puerto Rico to York County, Pennsylvania.  The couple frequently fought, and, around March 1998, Milton moved out of the couple's apartment.  On the evening of April 18, 1998, Miriam was seen at a local bar with a friend, Nelson Lugo a/k/a Manuel Santana ("Nelson").  At some point during the evening, Miriam and Nelson left the bar and walked to Miriam's apartment.

Later that evening, Vincent Rice, Miriam's next-door neighbor, was awakened sometime after 11:30 p.m.[1] by the sound of breaking glass on the common porch he shared with Miriam. Rice reported hearing Milton shout "open the door," after which he heard additional noises coming from the apartment. The following day, April 19, 1998, Rice looked through the window of Miriam's apartment and observed a man lying on the floor; at this point, he summoned the police.

When the police arrived at the scene, they observed that one pane of a four-pane window in the door to Miriam's apartment was broken; the broken pane was the closest to the door lock. Upon entering the apartment, the officers discovered Nelson's body in the kitchen and Miriam's body in the bedroom. Nelson had defensive wounds on his hands, his fingers were nearly severed, and he had a lipstick inserted in his mouth. Nelson's autopsy revealed that he died from a stab wound to the chest. Miriam had a broken nose, stab wounds to her eyes, and her head was nearly severed from her body. She was naked from the waist down, and her underwear was around her face. She was lying with her head on a pillow, and a high-heeled shoe was found under her buttocks. Miriam's autopsy revealed that she died from sharp force and blunt force injuries to her head and neck.

According to the trial testimony of Chris Ann Arrotti, a chemist employed with the Pennsylvania State Police, forensic testing was conducted on more than 70 items collected from the crime scene; approximately 17 of those items contained traces of human blood. Of the items that contained traces of human blood, two of the items contained traces of blood which did not belong to either victim: a white cloth bag found on a sofa bed near Miriam's body, and a kitchen window blind. The blood on both of

---

[1] The various witnesses at Appellant's trial provided different, and often inconsistent, estimations of the hour at which these events occurred.

those items was determined to belong to Milton Montalvo. Milton Montalvo's blood also was found on glass that remained in the broken window pane, and a hair collected from Nelson's hand was determined to belong to Milton Montalvo. There was no blood, hair, or fiber evidence that linked Appellant to the scene of the murders.

An arrest warrant was issued for Milton, and, in 1999, he was captured in Florida, and extradited to York County to stand trial for the murders of Miriam and Nelson. Ultimately, he was convicted of two counts of first-degree murder and one count of burglary, and, on February 14, 2000, he was sentenced to death. Approximately two months before Milton was arrested, Detective Roland Comacho, purportedly based on a statement given to him by Esther Soto, sought and obtained an arrest warrant for Appellant, charging him as a possible accomplice or participant in the murders. Appellant remained a fugitive until 2002, at which time he was discovered living under an assumed name, with an altered appearance, in Hudson County, New Jersey. Appellant was extradited to York County to stand trial, at which he was represented *pro hac vice* by Francis Cutruzzula, Esquire.[2] Frank Arcuri, Esquire served as local counsel.

In his opening statement at Appellant's trial, the prosecutor suggested that Appellant wanted to kill Miriam because he "was angry with Miriam because the ties with Milton had broken down," and because Miriam knew that Appellant "was living in this country under an alias having escaped from parole for automobile theft in Puerto

---

[2] Attorney Cutruzzula testified at Appellant's PCRA hearing that he met Appellant in the "bull pen" of the Hudson County Court House, following Appellant's arrest. When there was no public defender available to handle Appellant's extradition matter, the presiding criminal judge asked Attorney Cutruzzula to "stand in" and Attorney Cutruzzula met with Appellant in the jury room to discuss his extradition rights. Appellant agreed to waive extradition, and Attorney Cutruzzula ultimately was retained to represent Appellant in his homicide trial in Pennsylvania. N.T. PCRA Hearing, 7/11/11, at 5-6.

Rico." N.T. Trial, 3/13/03, at 421. The Commonwealth further posited that the victims' different injuries demonstrated that two different weapons were used − a knife and some other blunt object − and, therefore, that there must have been two assailants.

In addition to the above-described testimony of Vincent Rice, Miriam's next-door neighbor, the Commonwealth presented at trial the testimony of Miriam's downstairs neighbor, Fedelio Morrell. Morrell testified that, on the night of the murders, sometime between 2:00 and 2:30 a.m., he saw Milton at Miriam's door, and heard him tell her to open the door. Morrell also heard Milton shout that he had seen someone go into Miriam's apartment. Morrell recounted that, approximately 20 minutes later, he heard a woman's voice say "call the police, call the police," id. at 603, and then he fell asleep. Morrell testified that, 20 minutes after he fell asleep, he heard "noise on the floor and on the walls and something being dragged." Id.

The Commonwealth also presented Nici Negron, who operated a towing business, as a witness. Negron testified that Milton called him at around midnight on April 18, 1998, and when he arrived approximately one-half hour later at the location Milton specified, he observed Milton, "a pregnant [woman], and Milton's brother" inside or nearby Milton's Dodge van. Id. at 505-06.

Patricia Ascensio, Miriam's niece, was also called as a witness by the Commonwealth. Patricia testified that she and her boyfriend, Angel Santos ("Angel"), went to Appellant's apartment at approximately 9:00 p.m. on the evening of the murders so that Appellant's wife, who was known as "Ketty" or "Kathy," could do Patricia's hair. Patricia stated that she saw Milton at the apartment at approximately 9:30 p.m., but that Milton left at around 10:00 p.m. N.T. Trial, 3/13/03, at 483. Patricia testified that she and Angel left the apartment at approximately 11:00 p.m., and the only individuals present when they left were Appellant, Ketty, and Appellant's son. Id.

As the Commonwealth was unable to locate Angel Santos at the time of trial, the parties agreed to allow Angel's statements to Detective Lisa Daniels to be introduced through Detective Daniels' testimony. According to the police report prepared by Detective Daniels, Angel reported that he and Patricia were at Appellant's apartment with Appellant and Appellant's wife at approximately 12:30 a.m. on the morning of April 19, 1998; that Milton arrived sometime later and appeared "upset," "agitated," "hyped," and "sweating profusely"; that Milton asked Appellant, and then Angel, for $20; that Milton left the apartment between approximately 1:15 and 1:30 a.m. on the morning of April 19; and that he and Patricia left the apartment at approximately 2:00 a.m. that same morning. City of York Police Dep't Supplement to Complaint Report, 4/19/98; N.T. Trial, 3/13/03, at 580-81.[3]

The only evidence presented by the Commonwealth to connect Appellant to the murders was the testimony of Esther Soto ("Esther"). Esther testified that, on the afternoon of April 18, 1998, Milton visited the grocery store she operated with her husband at the time, Miguel Soto ("Miguel"). Esther testified that Milton used the store's telephone to call Miriam about unemployment checks she had received in the mail, that an argument ensued, and that she heard Milton shouting at Miriam over the telephone. As Milton was shouting at Miriam, Appellant entered the store and approached Milton. According to Esther, after Milton ended his telephone call, she heard him tell Appellant

---

[3] Appellant claims that Angel confirmed the truth of the statements he made to police during his April 19, 1998 interview, but, contrary to representations contained in a police report prepared by Detective Comacho on February 1, 1999 in which Detective Comacho described an interview with Angel and Patricia on that date, denied ever speaking with police about the murders after his initial April 19, 1998 interview. In support of this claim, Appellant submitted an affidavit from Alejandro Villasenor, a paralegal with the Federal Public Defender which represented Appellant during his federal habeas corpus proceedings, describing conversations he had with Angel.

that he wanted to kill Miriam. Appellant told Milton to "leave it to him," and stated that he would kill Miriam himself. N.T. Trial, 3/14/03, at 619.

Esther recounted that, later that evening, after she and Miguel were asleep, Milton and Appellant arrived at their house. Esther stated that she remained in bed while Miguel opened the door, and then she overheard Milton and Appellant describe to Miguel how they murdered Miriam and Nelson. Esther also testified that she recalled hearing Appellant tell her husband that he killed Miriam by cutting her throat, stabbing her in the eyes, and kicking her as she lay on the floor. According to Esther, Milton and Appellant wanted to stay at her house, but she and Miguel told them they could not stay; Miguel then gave them some money, and Milton and Appellant stated they were going to Florida. Id. at 623.

Esther claimed that, a day or so after the murders, she saw in the newspaper a telephone number for individuals who had information regarding the murders, and that, approximately two weeks after the murders, she called the police. Thereafter, Esther gave a recorded statement to Detective Comacho, telling him that she had overheard Milton tell Miguel that he killed Nelson, and that she overheard Appellant tell Miguel that he killed Miriam. Id. at 626-28.

On cross-examination, defense counsel questioned Esther regarding her testimony that she called the police two weeks after the murders, when, in fact, she did not give a statement to Detective Comacho until December 12, 1998, nearly eight months later. Although Esther initially indicated that she did not remember, id. at 660, she then admitted that she only contacted police at that time because she was "trying to get [her] van back" after it was taken into custody by Detective Comacho. Id. at 661.[4]

---

[4] Specifically, at Appellant's trial, Detective Comacho testified that police had entered information regarding Milton Montalvo's Dodge van into the National Crime Index Computer ("NCIC") system, but erroneously entered the license plate of Miguel Soto's (continued…)

Additionally, after Esther admitted on direct examination that, when testifying at Milton's trial, she repeatedly stated that she did not remember any statements made by Appellant, defense counsel asked Esther whether, in light of her changed testimony at Appellant's trial, she was admitting to lying during her testimony at Milton's trial. Id. at 638. Esther repeatedly stated that she "doesn't lie," and she maintained that she did not believe that claiming she didn't remember something was the same as lying. Id. at 638-39. Defense counsel also confronted Esther with, *inter alia*, the fact that, at Milton's preliminary hearing on May 20, 1999, Esther testified that Milton, not Appellant, told her and her husband on the morning of April 19, 1998 that Milton killed Miriam. Id. at 647. Esther responded: "I get nervous that day. I was so nervous all the time I'm nervous. I'm not the same person, okay." Id. at 649.

When asked by defense counsel if she lied when she testified at Milton's trial that Detective Comacho had "forced" her to change her testimony at Appellant's trial; that Detective Comacho "forced her to give the statement" that she gave; that the detective told her that if she didn't "say what he said[,] my business would be closed and I would

---

(…continued)

van, a Ford Aerostar. N.T. Trial, 3/18/04, at 199. As a result, when Miguel attempted to obtain the required registration for his van, there was a "pop up NCIC hit" for the homicide involving Milton. Id. at 199. Miguel was instructed by PennDot personnel to go to the Lancaster City Police Department, where he was met by Detective Comacho and another officer. Detective Comacho interviewed Miguel, and, upon "figuring out that he had some sort of connection to Milton," asked Miguel "what information . . . he had about the homicide." Id. at 200. According to Detective Comacho, Miguel stated that his wife, Esther, "also had information around," and the detective told Miguel he needed to speak with Esther. Id. At that point, Detective Comacho drove to Miguel's store, where he took possession of Miguel's van and placed it in the city garage. Detective Comacho reiterated to Miguel at that time that he "needed to talk to Esther." Id. at 201. Several days later, Esther went in for an interview with Detective Comacho.

go to jail and I won't see my kids," id. at 639-40, Esther responded, "[f]or me that is not lying." Id. at 640. When asked if she saw Detective Camacho in the courtroom at Appellant's trial, Esther identified him, and when asked "is that the detective that forced you to give this statement back in December of 1998?," she replied: "[y]es." Id. at 666.

Esther's testimony also conflicted with the testimony given by her husband Miguel Soto, a defense witness. Miguel testified that, in the early morning hours of April 19, 1998, his wife woke him up because someone was knocking at the door. N.T. Trial, 3/18/03, at 245. Miguel answered the door to Milton and Appellant. Id. When asked what, if anything, Milton said to him when he opened the door, Miguel replied, "Milton told me -- I don't want to say this -- that he had killed his wife." Id. Miguel testified that Milton did not explain how he killed his wife, but simply stated that "he had problems with the police because he had killed his wife," and that "he had to leave and he wanted to know if he could leave his brother -- and that's when I found out [Appellant] was his brother -- could stay at my house." Id. Miguel testified that Esther was upstairs when Milton made this statement. Id. at 246. After approximately 25 minutes, Miguel told them he did not want any problems and that Esther did not want them staying in the house, so they left. Id. at 247. When asked on cross-examination why he did not go to the police, Miguel explained that he intended to go to the police, but Esther convinced him not to do so because it would cause problems. Id. at 248-49. Miguel testified that he told Detective Comacho that Milton admitted to killing his wife when Miguel was interviewed by the detective nine months later, in November 1998, when he had problems obtaining the registration for his vehicle. Id. at 263.

In March 2003, more than three years after Milton was convicted of two counts of first-degree murder for the deaths of Miriam and Nelson, a jury convicted Appellant of first-degree murder for the death of Miriam, second-degree murder for the death of

Nelson, conspiracy to commit murder, and burglary. At the penalty phase of trial, the jury found two aggravating circumstances − that Appellant killed Miriam during the perpetration of a felony, 42 Pa.C.S.A. § 9711(d)(6), and Appellant had been convicted of another murder committed either before, or at the time of, the offenses at issue, 42 Pa.C.S.A. § 9711(d)(11).[5] The jury also found two mitigating factors − that Appellant had no significant history of prior criminal convictions, 42 Pa.C.S.A. § 9711(e)(1), and Appellant was a good worker, attended church, and was a good son to his mother, 42 Pa.C.S.A. § 9711(e)(8) (the "catch-all" mitigator). Ultimately, the jury determined the aggravating circumstances outweighed the mitigating circumstances, and recommended a sentence of death.

On April 14, 2003, the trial court imposed a sentence of death in connection with Miriam's murder, a sentence of life imprisonment for Nelson's murder, and concurrent terms of 10 to 20 years incarceration each for burglary and conspiracy to commit murder. Appellant filed a direct appeal to this Court, during which he was represented by Gerald Anthony Lord, Esquire.[6] On appeal, Appellant raised a variety of claims, including claims alleging ineffectiveness of trial counsel. On September 24, 2008, this Court affirmed Appellant's judgment of sentence, holding, *inter alia*, that Appellant's ineffectiveness claims must be deferred to post-conviction proceedings pursuant to Commonwealth v. Grant, 813 A.2d 726 (Pa. 2002). Commonwealth v. (Noel) Montalvo, 956 A.2d 926 (Pa. 2008).

---

[5] In this regard, Appellant's conviction for the murder of Nelson was used as an aggravating factor for sentencing in Appellant's conviction for the murder of Miriam.

[6] On March 22, 2004, prior to sentencing, Mary R. Ennis, Esquire, entered her appearance as counsel for Appellant, and Attorney Ennis filed an Amended Concise Statement of Matters Complained of on Appeal on Appellant's behalf. Thereafter, Attorney Ennis was granted leave to withdraw as counsel, and, on May 17, 2007, Attorney Lord was appointed to represent Appellant.

On July 27, 2009, Appellant filed a timely *pro se* PCRA petition. On November 5, 2009, Attorney Lord was granted leave to withdraw and Jeffrey Marshall, Esquire, was appointed to represent Appellant. Attorney Marshall filed an amended PCRA petition on Appellant's behalf on February 1, 2010. Then, on April 29, 2011, Attorney Marshall filed a supplement to the amended PCRA petition. Between March and September 2011, the PCRA court, by Judge Sheryl Ann Dorney, conducted four days of hearings,[7] and, on January 29, 2013, by opinion and order, Judge Dorney dismissed Appellant's amended PCRA petition. On February 27, 2013, Appellant filed a notice of appeal to this Court, and subsequently filed a statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b). On May 16, 2013, Judge Dorney issued an opinion disposing of Appellant's 15-plus claims raised on appeal, in many instances simply referring to her January 29, 2013 opinion and order.

On August 23, 2013, Appellant filed a motion to amend and supplement his Rule 1925(b) statement. As Judge Dorney had retired effective August 1, 2013, the matter was assigned to Judge Michael E. Bortner, who, on November 27, 2013, granted Appellant's motion to amend his 1925(b) statement. On December 2, 2013, Appellant filed an "Amended and Supplemental Statement of Matters Complained of Under [Pa.R.A.P. 1925(b)]". On December 3, 2013, Judge Bortner filed a single-page order denying Appellant PCRA relief, and stating, "[t]his Court defers to the reasoning and decision entered by the Honorable Judge Dorney of the York County Court of Common

---

[7] Witnesses who testified at the PCRA hearings included, *inter alia*, Attorney Cutruzzula; Angel Santos; R. Robert Tressel, a crime-scene forensic expert; Detective Comacho; Detective Dennis Williams, who conducted several witness interviews; Detective Daniels, Attorney Ennis; Allen Fuentes, an interpreter who assisted with Detective Williams' interview of Negron; and Attorney Lord.

Pleas on January 29, 2013." Order, 12/3/13. The matter is now before this Court, wherein Appellant raises the following claims:

1. The court's failure to provide Petitioner with the resources necessary to develop and present evidence supporting his claims involving the denial of his constitutional rights violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights and his rights under Article I, Sections 1, 6, 9, 13, 14, 25, and 26 of the Pennsylvania Constitution.

2. The Court erred in denying relief where counsel's abject failure to investigate or prepare in any manner for Petitioner's penalty hearing violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights and his rights under Article I, Sections 1, 9, 13 and 26 of the Pennsylvania Constitution.

3. The court erred in denying relief where, as a result of court error, prosecutorial misconduct and ineffective assistance of counsel, the sentencing jury was misinformed that its sentencing verdict would be a recommendation but that ultimate responsibility for Petitioner's death sentence rested elsewhere, in violation of 42 Pa. C.S. § 9711; Article I, Sections 9 and 13; and the Sixth, Eighth, and Fourteenth Amendment rights. Appellate counsel was ineffective for failing to raise these claims.

4. The court erred in denying relief where, as a result of prosecutorial misconduct, ineffective assistance of counsel, and court error, irrelevant non-statutory aggravation was presented and considered by the jury in reaching its sentencing determination in violation of Petitioner's Sixth, Eighth and Fourteenth Amendment rights and his rights under Article I, Sections 1, 6, 9 13, 14, 25 and 26 of the Pennsylvania Constitution.

5. The court erred in denying relief where the penalty phase jury instructions violated the Sixth, Eighth and Fourteenth Amendments and Article I, Sections 1, 6, 9, 13, 14, 25 and 26 of the Pennsylvania Constitution.

6. The court erred in denying relief where the jury was not instructed, in violation of the Sixth, Eighth, and Fourteenth Amendments that, under Pennsylvania Law, a sentence of life imprisonment means life without possibility of parole.

7. The court erred in denying relief where, as a result of ineffective assistance of counsel, prosecutorial misconduct and court error, the jury did not hear evidence of Petitioner's innocence and Petitioner was convicted and sentenced to death despite his innocence in violation of Petitioner's Sixth, Eighth and Fourteenth Amendment rights and his rights under Article I, Sections 1, 6, 9, 13, 14, 25 and 26 of the Pennsylvania Constitution.

8. The court erred in denying relief where the prosecution's election to pursue inconsistent theories of prosecution by first claiming that Petitioner's co-defendant was the actual murderer during the co-defendant's trial and then arguing that Petitioner was the murderer in Petitioner's subsequent trial violated Petitioners Sixth, Eighth and Fourteenth Amendment rights and his rights under Article I, Sections 1, 6, 9, 14, 25, 26 of the Pennsylvania Constitution.

9. The court erred in denying relief where the selection of a death qualified jury where Petitioner is innocent of death and Milton Montalvo's jury verdict precluded the Commonwealth from seeking death, violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights and his rights under Article I, Sections 1, 9, 13, 14, 25 and 26 of the Pennsylvania Constitution.

10. The court erred in denying relief where, as a result of court error and ineffective assistance of counsel, Petitioner was denied a fair and impartial jury in violation of his rights under the Sixth, Eighth and Fourteenth Amendments and his rights under Article I, Sections 1, 6, 9 and 13 of the Pennsylvania Constitution.

11. The court erred in denying relief where Petitioner was denied a fair and impartial jury in violation of his Sixth, Eighth, and Fourteenth Amendment rights and his rights under Article I, Sections 1, 9, 26 and 28 of the Pennsylvania

Constitution because the York County jury selection procedure systematically excluded minorities.

12. The court erred in denying relief where numerous instances of prosecutorial misconduct, individually and collectively, deprived petitioner of his Sixth, Eighth, and Fourteenth Amendment rights and his rights under Article I, Sections 1, 6, 9, 13, 14, 25 and 26 of the Pennsylvania Constitution.

13. The court erred in denying relief where the guilty phase instructions violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights. Trial and appellate counsels' failures to litigate these errors constituted ineffective assistance of counsel.

14. The court erred in denying relief where, as a result of court error, prosecutorial misconduct and ineffective assistance of counsel, the jury was exposed to constitutionally prohibitive identification testimony in violation of Petitioner's Sixth, Eighth and Fourteenth Amendment rights and Article I, Sections 1, 6, 9, 13, 14, 25 and 26 of the Pennsylvania Constitution.

15. The court erred in denying relief where the admission of detective Comacho's summary of Petitioner's purported statement to the police after his illegal arrest violated Petitioner's Sixth, Eighth, and Fourteenth Amendment rights and his rights under Article I, Sections 1, 9, 13, 14, 25, and 26 of the Pennsylvania Constitution.

16. The Court erred in denying relief because the cumulative effect of the errors require grant of relief.

Appellant's Brief at 4-6.[8]

---

[8] Although Appellant identifies nineteen issues in his Statement of Questions, he indicates that three of those issues were abandoned or duplicative of other claims. Thus, we have not listed those issues herein, and only the remaining sixteen issues are set forth.

## II. Analysis

In reviewing the denial of PCRA relief, we examine whether the PCRA court's determination is "supported by the record and free of legal error." Commonwealth v. Rainey, 928 A.2d 215, 223 (Pa. 2007). To be entitled to PCRA relief, an appellant must establish, by a preponderance of the evidence, that his conviction or sentence resulted from one or more of the enumerated errors in 42 Pa.C.S.A. § 9543(a)(2); his claims have not been previously litigated or waived, id. § 9543(a)(3); and the failure to litigate the issue prior to or during trial or on direct appeal could not have been the result of any rational, strategic, or tactical decision by counsel. Id. § 9543(a)(4). An issue is previously litigated if "the highest appellate court in which [the appellant] could have had review as a matter of right has ruled on the merits of the issue." Id. § 9544(a)(2). An issue is waived if appellant "could have raised it but failed to do so before trial, at trial, . . . on appeal or in a prior state postconviction proceeding." Id. § 9544(b).

In order to obtain relief on a claim of ineffectiveness of counsel, a PCRA petitioner must satisfy the performance and prejudice test set forth in Strickland v. Washington, 466 U.S. 668 (1984). In Pennsylvania, we have applied the Strickland test by requiring that a petitioner establish that (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's action or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability that the result of the proceeding would have been different. Commonwealth v. Pierce, 786 A.2d 203, 213 (Pa. 2001). In other words, prejudice is assessed in terms of whether the petitioner has shown that the demonstrated ineffectiveness sufficiently undermines confidence in the verdict. Commonwealth v. Fletcher, 896 A.2d 508, 516 n.10 (Pa. 2006). Counsel is presumed to have rendered effective assistance, and, if a claim fails under any required element of

the Strickland test, the court may dismiss the claim on that basis. Commonwealth v. Ali, 10 A.3d 282, 291 (Pa. 2010).

Of critical relevance to the present appeal, this Court repeatedly has explained that, in order to enable appellate review, PCRA courts are required to provide a "legally robust discussion, complete with clear findings of fact where required." Commonwealth v. Dennis, 950 A.2d 945, 957 (Pa. 2008) ("A generic statement that the record proves [PCRA] claims collectively non-meritorious tells us too little to support review."); see also Commonwealth v. Weiss, 986 A.2d 808, 816 n.4 (Pa. 2009) ("a fact-finding court should support its determinations with sufficient explanations of the facts and law, including specific citations to the record for all evidence on which it relies, and to the legal authority on which it relies, to facilitate appellate review"); Commonwealth v. Daniels, 963 A.2d 409, 435 (Pa. 2009) (holding that, where PCRA court failed to explain the basis for its conclusion that claims were meritless, we could not conduct meaningful appellate review).

Where a PCRA court fails to support its holding with sufficient explanations of the facts and law, or fails to provide an adequate opinion addressing all of the claims raised in a PCRA petition, including factual and credibility disputes, a remand is appropriate. See Weiss, 986 A.2d at 816 (remanding the matter to the PCRA court to address the "salient inquiry" of whether appellant received a fair trial, which will "necessarily entail a review of all the evidence presented at trial"); Daniels, supra (remanding matter to PCRA court for opinion addressing all of PCRA petitioner's claims); Commonwealth v. Peoples, 961 A.2d 109, 110 (Pa. 2008) (per curiam) (remanding to the PCRA court with directions "to resolve areas of material factual controversy and credibility disputes via numbered factual findings and to provide properly framed legal conclusions grounded in the criteria governing claims of deficient attorney stewardship"). In addition, such a

remand may necessitate further proceedings below. See e.g. Peoples, supra; Commonwealth v. Beasley, 967 A.2d 376, 391 (Pa. 2009) (upon remand to allow the PCRA court to address issues relating to the appellant's claims of ineffectiveness, PCRA court may "take all action necessary to conform the record to the [layering requirements of Commonwealth v. McGill, 832 A.2d 1014 (Pa. 2003)], including the admission of supplemental evidence."); Commonwealth v. Roy Williams, 732 A.2d 1167, 1181 (Pa. 1999) (because PCRA court failed to make an independent credibility determination regarding proposed testimony, and because the PCRA court as factfinder is in a superior position to make such determinations, PCRA court was directed, on remand, to conduct a hearing, and render its own, independent findings of fact and conclusions of law regarding the credibility of the proposed testimony, as well as its impact on the truth-determining process).

Unfortunately, the PCRA court's opinion in the instant case is deficient. In its January 29, 2013 Opinion and Order, issued after four days of hearings on Appellant's PCRA petition, the PCRA court inexplicably quoted nearly verbatim, and sequentially addressed, the issues set forth in Appellant's Pa.R.A.P. 1925(b) statements *filed on direct appeal*. See Statement of Issues Pursuant to Pa.R.A.P. 1925(b), 12/18/03; Amended Concise Statement of Matters Complained of on Appeal, 8/12/05. This discussion comprised the first 54 pages of the PCRA court's 55-page opinion.

Moreover, the PCRA court did not discuss Appellant's PCRA petition, or the appropriate standard for relief, until the last two pages of its opinion. The PCRA court's discussion in that regard reads, in its entirety:

> In the Motion before the Court, the Defendant primarily alleges ineffective assistance of all attorneys who represented him prior to his current counsel. In addition, the Defendant alleges prosecutorial misconduct, court error,

illegal arrest and various constitutional violations as a result thereof, and multiple constitutional violations.

In order to receive relief under the Post-Conviction Collateral Relief Act, a Defendant must prove 1) that he has been convicted of a crime, 2) that he is currently serving a sentence, awaiting execution of a death sentence, or is serving a sentence that must expire before he may begin serving the sentence in question, 3) the conviction resulted from an enumerated constitutional or statutory violation, 4) the allegation(s) has/have not been previously litigated or waived, and 5) the failure to litigate the issue(s) previously was not the result of a rational, strategic or tactical decision by counsel.

When alleging ineffective assistance of counsel, a Defendant bears the burden of proof. Counsel is presumed to be effective and the burden is on the Defendant to prove otherwise. He must demonstrate that 1) the underlying substantive claim(s) has/have arguable merit, 2) that there was no reasonable basis for counsel's action or failure to act, and 3) the Defendant suffered prejudice because of counsel's ineffectiveness.

After considering the testimony from trial, the testimony and exhibits from the hearings on the Defendant's present petition(s), arguments and briefs of counsel, we find that the Defendant has failed to prove that he is entitled to relief under the Post Conviction Collateral Relief Act.

PCRA Court Opinion, 1/29/13, at 54-55.

Furthermore, in response to Appellant's initial Pa.R.A.P. 1925(b) statement, Judge Dorney issued a 7-page opinion which largely referred back to her January 19, 2013 opinion. Further complicating matters, following Judge Dorney's retirement and the filing of Appellant's amended supplemental Pa.R.A.P. 1925(b) statement, Judge Bortner addressed the supplemental issues in a single-page order in which he merely deferred to the prior opinions of Judge Dorney, which, as observed above, were insufficient.

As a result of the PCRA court's failures, this Court has no findings of fact, no determinations of credibility, and no legal conclusions regarding Appellant's PCRA claims; in short, we have no basis upon which to conduct meaningful appellate review. In that there were more than 10 expert, lay, and other witnesses who testified at the PCRA hearings, including those noted above, see supra note 7, the lack of any credibility determinations by the PCRA court is particularly problematic in the instant case. Thus, we are constrained to remand this matter to the PCRA court. We recognize that, as Judge Dorney is no longer on the bench, the matter must be assigned to another judge. Further, we acknowledge that the judge to whom the matter is assigned will not have the benefit of having presided over Appellant's PCRA hearings. Thus, for those claims the assigned judge is unable to resolve on the existing record, the judge is authorized to conduct additional hearings, and admit evidence, as necessary. Peoples, supra; Beasley, supra; Williams, supra.

The order of the PCRA court is vacated, and the matter is remanded for further proceedings consistent with this opinion.

Jurisdiction relinquished.

Mr. Chief Justice Saylor, Messrs. Justice Eakin, Baer and Stevens join the opinion.