J-S83036-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :  IN THE SUPERIOR COURT OF
:  PENNSYLVANIA
:
         v.                        :
:
:
:
ANTONIO STAMPS ,             :
:
         Appellant         :  No. 936 WDA 2018

Appeal from the PCRA Order Entered June 6, 2018
in the Court of Common Pleas of Allegheny County
Criminal Division at No(s):  CP-02-CR-0012088-2011

BEFORE:   PANELLA, J., SHOGAN, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:          **FILED MARCH 20, 2019**

Antonio Stamps ("Stamps"), *pro se*, appeals from the Order denying his

Petition for Relief filed pursuant to the Post Conviction Relief Act ("PCRA").[1]

We affirm.

On direct appeal, this Court set forth the facts underlying the instant

appeal as follows:

> On May 11, 2011, Tanika Tyson [("Tyson")] was at the window of
> her home on Crucible Street in the Crafton Heights area of
> Pittsburgh[,] waiting for a ride.  She observed a dark-colored SUV
> pull into a parking lot; the vehicle then turned around and drove
> down the street.  Tyson did not see the car stop[,] but heard a
> pop that sounded like a gunshot.  (Notes of [T]estimony, 7/16-
> 19/12 at 202-203, 391-393.)
>
> Pittsburgh 911 dispatcher Amy Chushanick [("Chushanick")]
> received multiple calls reporting shots fired in the 1500 block of

_____

[1] 42 Pa.C.S.A. §§ 9541-9546.

Crucible Street. One caller[,] who identified himself as John[,] stated a 20-year-old man had been shot in the chin by another man at 1558 Crucible Street. The caller stated he had no idea who shot the victim[,] and reported the victim was unresponsive and his breathing was becoming labored. A second anonymous call reported a shooting at 1556 Crucible Street. This caller heard arguing[,] possibly among three men[,] but did not see what transpired; a single gunshot was heard.[FN1]

---

[FN1] The 911 tapes were played for the jury.

---

Chushanick later placed a return call to a caller and spoke to Eboni Cutler [("Cutler")]. Cutler was crying[,] and stated a black man wearing a blue and white striped hoody, blue jeans, and black Timberlands had exited the passenger side of his SUV and shot the victim. (*Id.* at 340-341.) Cutler identified the shooter as "Mook," which Chushanick relayed to responding police officers. (*Id.* at 341-342.) On the broadcast, one of the officers noted that [Stamps] went by the nickname "Mook." (*Id.* at 345-346.)

Officer Vincent Pacheco [("Officer Pacheco")] arrived first to the scene and observed the victim lying in a patio area with four females around him, one holding a towel underneath his chin. (*Id.* at 87-89.) The patrolman tried to get as much information from the victim as he could. (*Id.* at 89.) When he asked the victim who the shooter was, the victim was only able to make a "gurgling sound." (*Id.* at 90.) The victim was pronounced dead on June 8, 2011, 27 days after he was shot. An autopsy revealed that a gunshot wound had fractured his chin, traveled to the back of his head, and fractured his spinal cord; this resulted in immediate quadriplegia and paralysis. A medium caliber bullet with a full metal jacket was recovered from the victim's spinal cavity.[FN2] Dr. Todd Luckasevic stated the victim died of a penetrating gunshot wound to the neck[,] and that the manner of death was homicide.

---

[FN2] The single .45 automatic casing found at the scene was processed; no fingerprints were discovered. This shell casing was consistent with having discharged the bullet that killed the victim.

---

At the scene, officers made contact with Cutler, who, at the time, wished to remain anonymous out of her fear for her safety and the safety of her child. (*Id.* at 256.) Cutler told the officers that she knew the identity of the shooter as "Mook"[,] who is [] Stamps. Officer Pacheco testified that [Cutler] reported [that Stamps] was wearing a blue and white striped hoody, but the description included in his report indicated the shooter was wearing a "hoody sweatshirt black." (*Id.* at 125-126.) Officer Pacheco claimed this was a typographical error. (*Id.* at 126-127.) Cutler was present when the officers asked the victim if he knew who shot him; Cutler testified that she believed the victim did not identify the shooter because of the "code of the streets." (*Id.* at 255-256.)

At trial, Cutler explained that she previously had a relationship with [Stamps,] and knew his street name to be "Mook." (*Id.* at 209.) Cutler testified that at approximately 6:00 or 7:00 p.m., she was with [Stamps] and the victim at a cookout near the location of the shooting. (*Id.* at 210-211.) [Stamps] and the victim had an argument over a bond the victim paid for [Stamps]. (*Id.* at 212.) At this point, Cutler testified that [Stamps] had on [an] "all black and a blue and white striped hoody." (*Id.* at 214.) The argument ended[,] and [Stamps] got in his SUV and drove away. (*Id.* at 215.) Cutler called [Stamps] and told him not to return[,] as she was worried "something bad was about to happen." (*Id.* at 217.) She testified that he did not sound angry, but she heard a clicking that sounded like "gun metal" being racked over the phone. (*Id.* at 218-219.)

Later that night, Cutler was outside her home, which[,] she explained[,] is up on a hill, and she saw [Stamps's] SUV drive down Crucible Street, turn around in a rental office parking lot, and park. The area was illuminated by automatic street lights, and Cutler had an unobstructed view as [Stamps] approached the victim. (*Id.* at 220-222, 225.) Cutler observed the tip of a silver gun in his hand. (*Id.* at 226.) Cutler claimed this person was [Stamps] based on his clothing, "all black and blue and white striped hoody[,]" with the hood up obstructing his face. (*Id.* at 223-224.) However, Cutler recognized [Stamps's] mouth and build. (*Id.* at 224.)

Cutler testified that Rodger Henderson [("Henderson")] was also present and "playing peacekeeper." (*Id.* at 227.) Henderson told [Stamps] to put the gun away and "just fight it out." (*Id.*) Cutler stated the victim looked scared and "just stood there"; he did not have a weapon. (*Id.* at 227-228.) [Stamps] was pacing back and forth and wiping his mouth. (*Id.* at 228.) Cutler heard [Stamps] say, "he was [the victim's] bro, and he loved [the victim]." (*Id.*) [Stamps] then lifted the gun over Henderson's shoulder and shot the victim, who immediately dropped to the ground. [Stamps] walked up the hill toward where Cutler was standing, got into his SUV, and left the scene. (*Id.* at 229-230.)

Cutler testified that around the time of the victim's death, in early June 2011, she heard from [Stamps,] who was at a relative's house in Detroit. (*Id.* at 257-258.) When Cutler asked him why he shot the victim, [Stamps] "acted like he didn't know what I was talking about and changed the subject." (*Id.* at 257.)[FN3] On June 29, 2011, almost seven weeks after the shooting, Cutler was shown a collection of photographs and identified [Stamps] as the shooter. (*Id.* at 258-260.) Cutler also gave a taped statement to the detectives. [Stamps] was apprehended in Detroit on August 3, 2011.

---

[FN3] At the conclusion of Cutler's testimony, the court went on a site visit to Cutler's home and the scene of the shooting shortly after 2:00 p.m. (*Id.* at 296-299.)

---

Detective Christine Williams [("Detective Williams")] recalled that officers went to seven apartments looking for witnesses. Two individuals recalled hearing a gunshot[,] but did not go to the window to see what happened. (*Id.* at 56, 79.) The residents of the other apartments were not home or did not answer their doors. Over defense objection, [Detective Williams] testified that people rarely cooperate[,] as they are afraid to get involved. (*Id.* at 57-58.) When asked about the level of cooperation she had seen in her 19 years as a detective, she stated, "it is not very common at all. When we talk to people, they say, 'Don't you understand? I have to live here. I don't want to testify. I can't say nothing. I'm afraid. I got to stay here. You don't have to live here.' That's basically what we hear." (*Id.* at 58-59.)

- 4 -

Pittsburgh Homicide Detective James McGee [("Detective McGee")] testified that Stamps was not licensed to carry a firearm. [Detective] McGee further explained that law enforcement made efforts to locate witnesses to the shooting, including [] Henderson[,] who was located in the Allegheny County Jail; Henderson refused to speak to the police.

Henderson testified for the defense and stated that he had witnessed the shooting. Henderson claimed to have been outside with friends when he turned and saw a man wearing solid dark clothing and a ski mask, holding a gun in his left hand. Henderson briefly struggled with the gunman[,] who broke free[,] and Henderson fled. (*Id.* at 412-413.) Henderson stated that [Stamps] was not present when the shooting occurred. Henderson stated [that] he believed the shooter was approximately 5'11" tall[,] and that [Stamps] was about 6'2" tall. On cross-examination, Henderson admitted he was friends with [Stamps], and despite their friendship, he failed to provide any information to police when they approached him in jail. He also admitted to having previously pled guilty to the crimes of providing false identification to a police officer and intimidation of a witness. (*Id.* at 417-418.)

[Stamps] was charged with one count of criminal homicide and one count of firearms not to be carried without a license. On July 15, 2012, a jury trial was conducted, and thereafter, [Stamps] was found guilty of first[-]degree murder and the firearms offense. On September 26, 2012, [Stamps] was sentenced to life imprisonment with no further penalty imposed.

*Commonwealth v. Stamps*, 118 A.3d 441 (Pa. Super. 2015) (unpublished memorandum at 1-7) (footnotes in original). On January 8, 2015, this Court affirmed Stamps's judgment of sentence. *See id.* Stamps did not petition our Supreme Court for allowance of appeal.

On September 14, 2015, Stamps filed the instant PCRA Petition, his first. The PCRA court appointed counsel to represent Stamps, who filed an Amended Petition. The Amended Petition alleged one claim of ineffective assistance of

trial counsel, for failure to cross-examine Cutler. On August 29, 2016, the PCRA court issued Notice of its intent to dismiss Stamps's PCRA Petition without a hearing, pursuant to Pa.R.Crim.P. 907. Thereafter, Stamps filed a *pro se* Application for leave to file objections, rebuttals, and a *pro se* response to the Notice to dismiss. On October 14, 2016, the PCRA court entered its Order dismissing Stamps's PCRA Petition. That same day, the PCRA court issued an Opinion, which included a discussion of Stamps's *pro se* claims.

Stamps's counsel subsequently filed a Notice of Appeal, followed by a Motion for a hearing pursuant to **Commonwealth v. Grazier**, 713 A.2d 81 (Pa. 1998). After a **Grazier** hearing, the PCRA court denied Stamps permission to proceed *pro se*. On December 30, 2016, Stamps filed a *pro se* Motion for another **Grazier** hearing, which the PCRA court denied, without a hearing, on January 4, 2017. Thereafter, Stamps filed, in this Court, a Motion for a **Grazier** hearing. On February 28, 2017, this Court remanded the matter for a **Grazier** hearing. On remand, after a hearing, the PCRA court entered an Order permitting Stamps to proceed *pro se*.

On August 22, 2017, this Court again remanded the case, so as to allow Stamps to file a *pro se* Amended PCRA Petition. Stamps thereafter filed the *pro se* Amended PCRA Petition underlying this appeal, raising three claims of ineffective assistance of trial counsel. The Commonwealth filed an Answer, after which the PCRA court issued Notice of its intent to dismiss the *pro se* Amended PCRA Petition without a hearing. On June 6, 2018, after Stamps

responded to the Notice to dismiss, the PCRA court dismissed Stamps's *pro se* Amended PCRA Petition. Thereafter, Stamps filed the instant timely appeal, followed by a court-ordered Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal.

Stamps presents the following claims for our review:

[1.] Is [Stamps] entitled to a global new trial or arrest of judgment insofar as the [PCRA court] abused its discretion by ruling in [Stamps's] favor that [] counsel's ineffectiveness prongs were satisfied with respect to Commonwealth's witness [] Cutler's pending criminal charges being omitted during trial to the jurors were bias [*sic*], but not prejudice[,] and also failing to rule on the amended *quid pro quo* claim?

[2.] Is [Stamps] entitled to a global new trial or arrest of judgment based [on the court's] evidentiary ruling that [Stamps's] rights under due process weren't violated insofar as [Stamps] elected not to go to the site visit[,] unencumbered[,] at the word of counsel; and lack of colloquy violated due process and [] Pa.R.Crim.P. 602?

[3.] Is [Stamps] entitled to a global new trial or arrest of judgment inasfar as the trial court abused its discretion by flouting the rules of court by allowing the District Attorney to permit [] Cutler to testify to the decedent's state of mind and Detective [Williams's] hearsay testimony as an expert witness, notwithstanding the [District Attorney's] ability to make a farce and mockery of defense witness [] Henderson'[s] ***Miranda***[2] rights on the stand, without objection by trial counsel?

Brief for Appellant at 4 (footnote added).

Stamps first claims that in denying him relief, the PCRA court misapplied the law regarding the bias of Cutler, and the existence of a potential deal

_____

2 ***See Miranda v. Arizona***, 384 U.S. 436 (1966).

between the Commonwealth and Cutler. *See* Brief for Appellant at 11. Stamps contends that "during trial, it is incumbent on the District Attorney to question [its] witnesses on direct-examination about pending criminal charges[,] in order for defense counsel to cross-examine any bias or corrupt motives by said [witness]." *Id.* at 12. According to Stamps, information regarding Cutler's pending criminal charges "would have given weight to this claim of [a] due[-]process violation." *Id.* at 14. Stamps asserts that without Cutler's testimony, there would have been no indictment. *Id.* Stamps further observes that Cutler received no jail time for her subsequent convictions for trespass and simple assault. *Id.* at 16. Regarding prejudice resulting from counsel's alleged dereliction, Stamps argues that the trial court's jury charge instructed the jury that Cutler's bias "equates to prejudice," and cites *Commonwealth v. Davido*, 106 A.3d 611, 645 (Pa. 2014), in support of his claim of prejudice. Brief for Appellant at 17-18.

"In reviewing the denial of PCRA relief, we examine whether the PCRA court's determination is supported by the record and free of legal error." *Commonwealth v. Montalvo*, 114 A.3d 401, 409 (Pa. 2015) (citation and internal quotation marks omitted).

To be entitled to relief on a claim of ineffective assistance of counsel, a petitioner must plead and prove that

> the underlying claim is of arguable merit, counsel's performance lacked a reasonable basis, and counsel's ineffectiveness caused him prejudice. Prejudice in the context of ineffective assistance of counsel means demonstrating there is a reasonable probability

that, but for counsel's error, the outcome of the proceeding would have been different…. Failure to establish any prong of the test will defeat an ineffectiveness claim.

***Commonwealth v. Solano***, 129 A.3d 1156, 1162-63 (Pa. 2015) (citations omitted).

The PCRA court rejected Stamps's claim based upon his failure to establish prejudice resulting from counsel's failure to cross-examine Cutler effectively regarding bias. ***See*** PCRA Court Opinion, 10/14/16, at 2 (stating that Stamps failed to establish the prejudice prong of his ineffectiveness claim); ***see also*** PCRA Court Opinion, 9/1/15, at 1 (stating that "[h]ad [Cutler's] pending charges been highlighted for the jury, [the PCRA] [c]ourt holds the firm belief that the result would not have been different."). We agree with the PCRA court's assessment.

Our review of the record discloses that Cutler identified Stamps as the perpetrator on May 11, 2011, June 29, 2011, and September 3, 2011. ***See*** N.T., 55 (wherein Detective Williams testified that a witness identified "Mook" as the shooter upon the detective's arrival at the shooting scene), 95-96 (wherein Officer Pacheco testified that a woman at the scene identified "Mook" as the assailant), 108-09 (wherein Office Pacheco testified that he later discovered the name of the woman at the scene, who had identified "Mook" as the assailant, to be Cutler), 259-60 (wherein Cutler testified at trial that on June 29, 2011, she identified Mook's photo, to police, as depicting the perpetrator of the shooting). Thus, the Commonwealth presented evidence

that Cutler's identification of Stamps as the perpetrator remained consistent both before and after the unrelated criminal charges were filed against her. Even if Cutler had been cross-examined about her pending criminal charges, the evidence would establish that Cutler did not change her identification of Stamps as a result of the pending criminal charges. Thus, there is no evidence that would support Stamps's claim of bias. Under these circumstances, we discern no abuse of discretion by the PCRA court in rejecting Stamps's ineffectiveness claim. *See Commonwealth v. Dennis*, 950 A.2d 945, 954 (Pa. 2008).

In his second claim, Stamps argues that his counsel rendered ineffective assistance by not seeking to colloquy Stamps regarding his decision not to be present during the jury's crime scene site visit. Brief for Appellant at 19. Stamps argues that "he was not abreast of trial counsel's prevaricated reasoning to the trial court that [Stamps] had foregone his presence at the site visit if 'h[e] can[]not go unencumbered.'" *Id.* (emphasis omitted). Stamps contends that pursuant to Pa.R.Crim.P. 602, a colloquy was required before he forewent his due-process right to attend all stages of the trial. *Id.* Stamps further challenges the lack of a stenographic record of the site visit. *Id.* at 20. Thus, Stamps asserts that he should have been advised of the consequences of foregoing his right to be present during the site visit, and that counsel rendered ineffective assistance by failing to object to the lack of

- 10 -

a colloquy or a stenographic record. *Id.* at 21. According to Stamps, the absence of a colloquy violated his right to due process. *Id.* at 24.

In *Snyder v. Massachusetts*, 291 U.S. 97 (1934) (overruled in part on other grounds), the United States Supreme Court held that the Due Process Clause of the Fourteenth Amendment was not violated by excluding a defendant from an on-site inspection by a jury, where the defendant's attorney was present and participated, along with the prosecutor, in directing the jury's attention to various aspects of the location under inspection by the jury. *Id.* at 108. The Court explained that "the presence of the defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, *and to that extent only*." *Id.* at 107-08 (emphasis added). The Supreme Court explained that the defendant's presence at a jury view is not among those constitutional rights "conferred so explicitly as to leave no room for an inquiry whether prejudice to a defendant has been wrought through their denial." *Id.* at 116; *cf. United States v. Walls,* 443 F.2d 1220, 1223 (6th Cir. 1971) (finding "reversible error for the court to deny appellant *and his attorney* the opportunity to attend the view to insure against the intrusion of prejudicial error" (emphasis added), but basing its decision upon its supervisory authority over the administration of criminal justice in the district courts and not the Constitution).

Contrary to Stamps's assertions, the Pennsylvania Supreme Court's decision in *Commonwealth v. Hunsberger*, 58 A.3d 32 (Pa. 2012), affords

him no relief. In *Hunsberger*, the defendant challenged his exclusion from *voir dire* proceedings. *Id.* at 36. Our Supreme Court recognized that the United States Supreme Court has "explicitly affirmed that *voir dire* is a critical stage of the criminal proceeding, during which the defendant has a constitutional right to be present[.]" *Id.* at 37. Our Supreme Court did not address whether a site visit is a critical stage of a criminal proceeding. Further, the failure to colloquy Stamps, regarding his attendance at the site visit, does not rise to the level of a violation of his constitutional rights. *See Commonwealth v. Mallory*, 941 A.2d 686, 697 (Pa. 2008) (explaining that "[a] waiver colloquy is a procedural device; it is not a constitutional end or a constitutional 'right.'").

Thus, Stamps has not established that the failure to engage in a colloquy, prior to his decision to forego attending the site visit, violated his right to due process. As such, Stamps has failed to plead and prove the first prong of a claim of ineffective assistance of counsel, *i.e.*, that his claim has arguable merit.[3] We therefore are unable to grant Stamps relief on this claim.

In his third claim, Stamps argues that the PCRA court improperly rejected his claim of prosecutorial misconduct during Cutler's trial testimony.

---

[3] We additionally discern no prejudice resulting from the lack of a stenographic record of the site visit. Stamps's counsel was present during the site visit. Stamps does not set forth how, but for the lack of a stenographic record of the site visit, the outcome of his trial would have been different. *See Solano*, 129 A.3d at 1162. Thus, Stamps failed to establish the prejudice prong of his ineffectiveness claim.

- 12 -

Brief for Appellant at 25. Stamps directs our attention to Cutler's testimony regarding the victim's statement that denied knowledge of the identity of his assailant. *Id.* at 26. At that time, the Commonwealth elicited the following testimony:

[Q. The Commonwealth]: Would [the victim] ever tell the police anything?

[A. Cutler]: No.

[Q.] Can you explain why not?

[A.] Because [*sic*] the code of the streets.

*See* Brief for Appellant at 26 (citation omitted). Stamps argues that the above testimony constituted hearsay, resulting in prejudice. *Id.*

Stamps claims that counsel's inaction led to testimony by Detective Williams regarding the reasons for a lack of cooperation by witnesses. *Id.* at 26-27. According to Stamps, "[w]ithout a curative instruction[, Stamps] suffered a g[ro]tesque due process violation." *Id.*

Stamps additionally argues misconduct in that

[t]he trial court further opened the door for [the Commonwealth] to go on a pernicious rampage in overruling the ***Miranda*** progeny when scholding [*sic*] defense witness [] [H]enderson's assertion that he remained silent during custodial interrogation to avoid being self incrimination [*sic*].

*Id.* at 28 (footnote omitted).

Our review of the record discloses that Stamps's trial counsel, in fact, objected to Cutler's testimony regarding the reason why the victim would not identify his assailant. *See* N.T., 7/16-19/12, at 225-26. In addition, during

- 13 -

the cross-examination of Henderson, Stamps's trial counsel objected to Henderson's reference to *Miranda*, and challenged the relevance of *Miranda* to Henderson's testimony. *See id.* at 416. The fact that counsel's objection was ultimately unsuccessful does not render trial counsel ineffective. *See Commonwealth v. Walker*, 36 A.3d 1, 12 (Pa. 2011) (in declining to remand for development of the record, stating that the fact that counsel's chosen tactic ultimately was unsuccessful does not render counsel's assistance ineffective).

More importantly, our review of the record discloses that Stamps raised his challenge to Detective Williams's testimony during his direct appeal. *See Stamps*, unpublished memorandum at 12 (wherein Stamps claims improper bolstering of Cutler's identification, based upon Detective Williams's testimony that people do not typically cooperate with police). During direct appeal, Stamps claimed that "the trial court erred in allowing officers to testify that people do not typically come forward and cooperate with police." *Stamps*, unpublished memorandum at 12. This Court rejected that claim. *See id.* at 12-13. Thus, Cutler's testimony was merely cumulative of other, properly admitted testimony. Under these circumstances, we discern no abuse of discretion by the PCRA court in rejecting Stamps's claim. Consequently, Stamps fails to establish prejudice resulting from the failure to seek a curative

instruction.[4] *See Commonwealth v. Boone*, 862 A.2d 639, 646 (Pa. Super. 2004).

Because we find no merit to the claims raised by Stamps, we affirm the Order of the PCRA court.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/20/2019

---

[4] Further, Stamps previously litigated a challenge to the substance of Cutler's testimony on direct appeal. Because the claim was previously litigated, his present claim is not cognizable under the PCRA. *See Commonwealth v. Banks*, 656 A.2d 467, 469 (Pa. 1995) (stating that, "[t]o be eligible for PCRA relief, [an a]pellant must establish, by a preponderance of the evidence, that his conviction or sentence resulted from one or more of the enumerated errors or defects found in section 9543(a)(2)[,] and that his issues have not been previously litigated").