**[J-59AB-2020]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 774 CAP |
| | : | |
| Appellant | : | Appeal from the order entered on |
| | : | February 11, 2019 in the Court of |
| | : | Common Pleas, York County, |
| v. | : | Criminal Division at No. CP-67-CR- |
| | : | 0000753-1999. |
| | : | |
| NOEL MATOS MONTALVO, | : | SUBMITTED: July 8, 2020 |
| | : | |
| Appellee | : | |
| | | |
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 776 CAP |
| | : | |
| Appellee | : | Appeal from the order entered on |
| | : | February 11, 2019 in the Court of |
| | : | Common Pleas, York County, |
| v. | : | Criminal Division at No. CP-67-CR- |
| | : | 0000753-1999. |
| | : | |
| NOEL MATOS MONTALVO, | : | SUBMITTED: July 8, 2020 |
| | : | |
| Appellant | : | |


**OPINION**


**JUSTICE TODD**                                     **DECIDED: January 20, 2021**

Before our Court in this capital case is the Commonwealth's appeal of the order of

the York County Court of Common Pleas granting the petition of Noel Matos Montalvo

(hereinafter, "Noel") for relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.

§§ 9541 *et seq.*, in the form of a new guilt-phase trial.[1] Also before us is Noel's cross-appeal, in which he challenges the trial court's rejection of a myriad of additional bases for granting him a new guilt-phase trial. For the reasons that follow, we affirm the trial court's grant of a new guilt-phase trial.

## I. BACKGROUND

This case arises from the March 1998 murder of Miriam Ascencio and Nelson Lugo, the circumstances of which were summarized previously by this Court:

> [Noel] is the brother of Milton Montalvo ("Milton"). In 1995, Milton and his common law wife, Miriam Ascencio ("Miriam"), moved from Puerto Rico to York County, Pennsylvania. The couple frequently fought, and, around March 1998, Milton moved out of the couple's apartment. On the evening of April 18, 1998, Miriam was seen at a local bar with a friend, Nelson Lugo a/k/a Manuel Santana ("Nelson"). At some point during the evening, Miriam and Nelson left the bar and walked to Miriam's apartment. Later that evening, Vincent Rice, Miriam's next-door neighbor, was awakened sometime after 11:30 p.m. by the sound of breaking glass on the common porch he shared with Miriam. Rice reported hearing Milton shout "open the door," after which he heard additional noises coming from the apartment. The following day, April 19, 1998, Rice looked through the window of Miriam's apartment and observed a man lying on the floor; at this point, he summoned the police.
>
> When the police arrived at the scene, they observed that one pane of a four-pane window in the door to Miriam's apartment was broken; the broken pane was the closest to the door lock. Upon entering the apartment, the officers discovered Nelson's body in the kitchen and Miriam's body in the bedroom. Nelson had defensive wounds on his hands, his fingers were nearly severed, and he had a lipstick inserted in his mouth. Nelson's autopsy revealed that he died from a stab wound to the chest. Miriam had a broken nose, stab wounds to her eyes, and her head was nearly severed from

---

[1] In capital cases, this Court has exclusive appellate jurisdiction over orders finally disposing of petitions for relief pursuant to the PCRA. *See* 42 Pa.C.S. §§ 722(4), 9546(d); *Commonwealth v. Williams*, 936 A.2d 12, 17 n.13 (Pa. 2007).

her body. She was naked from the waist down, and her underwear was around her face. She was lying with her head on a pillow, and a high-heeled shoe was found under her buttocks. Miriam's autopsy revealed that she died from sharp force and blunt force injuries to her head and neck.

According to the trial testimony of Chris Ann Arrotti, a chemist employed with the Pennsylvania State Police, forensic testing was conducted on more than 70 items collected from the crime scene; approximately 17 of those items contained traces of human blood. Of the items that contained traces of human blood, two of the items contained traces of blood which did not belong to either victim: a white cloth bag found on a sofa bed near Miriam's body, and a kitchen window blind. The blood on both of those items was determined to belong to Milton Montalvo. Milton Montalvo's blood also was found on glass that remained in the broken window pane, and a hair collected from Nelson's hand was determined to belong to Milton Montalvo. There was no blood, hair, or fiber evidence that linked [Noel] to the scene of the murders.

An arrest warrant was issued for Milton, and, in 1999, he was captured in Florida, and extradited to York County to stand trial for the murders of Miriam and Nelson. Ultimately, he was convicted of two counts of first-degree murder and one count of burglary, and, on February 14, 2000, he was sentenced to death. Approximately two months before Milton was arrested, Detective Roland Comacho, purportedly based on a statement given to him by Esther Soto, sought and obtained an arrest warrant for [Noel], charging him as a possible accomplice or participant in the murders. [Noel] remained a fugitive until 2002, at which time he was discovered living under an assumed name, with an altered appearance, in Hudson County, New Jersey. [Noel] was extradited to York County to stand trial, at which he was represented *pro hac vice* by Francis Cutruzzula, Esquire. Frank Arcuri, Esquire served as local counsel.

In his opening statement at [Noel's] trial, the prosecutor suggested that [Noel] wanted to kill Miriam because he "was angry with Miriam because the ties with Milton had broken down," and because Miriam knew that [Noel] "was living in this country under an alias having escaped from parole for automobile theft in Puerto Rico." The Commonwealth further posited that the victims' different injuries demonstrated that

two different weapons were used − a knife and some other blunt object − and, therefore, that there must have been two assailants.

In addition to the above-described testimony of Vincent Rice, Miriam's next-door neighbor, the Commonwealth presented at trial the testimony of Miriam's downstairs neighbor, Fedelio Morrell. Morrell testified that, on the night of the murders, sometime between 2:00 and 2:30 a.m., he saw Milton at Miriam's door, and heard him tell her to open the door. Morrell also heard Milton shout that he had seen someone go into Miriam's apartment. Morrell recounted that, approximately 20 minutes later, he heard a woman's voice say "call the police, call the police," and then he fell asleep. Morrell testified that, 20 minutes after he fell asleep, he heard "noise on the floor and on the walls and something being dragged."

The Commonwealth also presented Nici Negron, who operated a towing business, as a witness. Negron testified that Milton called him at around midnight on April 18, 1998, and when he arrived approximately one-half hour later at the location Milton specified, he observed Milton, "a pregnant [woman], and Milton's brother" inside or nearby Milton's Dodge van.

Patricia Ascen[c]io, Miriam's niece, was also called as a witness by the Commonwealth. Patricia testified that she and her boyfriend, Angel Santos ("Angel"), went to [Noel's] apartment at approximately 9:00 p.m. on the evening of the murders so that [Noel's] wife, who was known as "Ketty" or "Kathy," could do Patricia's hair. Patricia stated that she saw Milton at the apartment at approximately 9:30 p.m., but that Milton left at around 10:00 p.m. Patricia testified that she and Angel left the apartment at approximately 11:00 p.m., and the only individuals present when they left were [Noel], Ketty, and [Noel's] son.

As the Commonwealth was unable to locate Angel Santos at the time of trial, the parties agreed to allow Angel's statements to Detective Lisa Daniels to be introduced through Detective Daniels' testimony. According to the police report prepared by Detective Daniels, Angel reported that he and Patricia were at [Noel's] apartment with [Noel] and [Noel's] wife at approximately 12:30 a.m. on the morning of April 19, 1998; that Milton arrived sometime later and appeared

"upset," "agitated," "hyped," and "sweating profusely"; that Milton asked [Noel], and then Angel, for $20; that Milton left the apartment between approximately 1:15 and 1:30 a.m. on the morning of April 19; and that he and Patricia left the apartment at approximately 2:00 a.m. that same morning. City of York Police Dep't Supplement to Complaint Report, 4/19/98; N.T. Trial, 3/13/03, at 580-81.

The only evidence presented by the Commonwealth to connect [Noel] to the murders was the testimony of Esther Soto ("Esther"). Esther testified that, on the afternoon of April 18, 1998, Milton visited the grocery store she operated with her husband at the time, Miguel Soto ("Miguel"). Esther testified that Milton used the store's telephone to call Miriam about unemployment checks she had received in the mail, that an argument ensued, and that she heard Milton shouting at Miriam over the telephone. As Milton was shouting at Miriam, [Noel] entered the store and approached Milton. According to Esther, after Milton ended his telephone call, she heard him tell [Noel] that he wanted to kill Miriam. [Noel] told Milton to "leave it to him," and stated that he would kill Miriam himself.

Esther recounted that, later that evening, after she and Miguel were asleep, Milton and [Noel] arrived at their house. Esther stated that she remained in bed while Miguel opened the door, and then she overheard Milton and [Noel] describe to Miguel how they murdered Miriam and Nelson. Esther also testified that she recalled hearing [Noel] tell her husband that he killed Miriam by cutting her throat, stabbing her in the eyes, and kicking her as she lay on the floor. According to Esther, Milton and [Noel] wanted to stay at her house, but she and Miguel told them they could not stay; Miguel then gave them some money, and Milton and [Noel] stated they were going to Florida.

Esther claimed that, a day or so after the murders, she saw in the newspaper a telephone number for individuals who had information regarding the murders, and that, approximately two weeks after the murders, she called the police. Thereafter, Esther gave a recorded statement to Detective Comacho, telling him that she had overheard Milton tell Miguel that he killed Nelson, and that she overheard [Noel] tell Miguel that he killed Miriam.

On cross-examination, defense counsel questioned Esther regarding her testimony that she called the police two weeks after the murders, when, in fact, she did not give a statement to Detective Comacho until December 12, 1998, nearly eight months later. Although Esther initially indicated that she did not remember, she then admitted that she only contacted police at that time because she was "trying to get [her] van back" after it was taken into custody by Detective Comacho. *Id.* at 661.[2]

Additionally, after Esther admitted on direct examination that, when testifying at Milton's trial, she repeatedly stated that she did not remember any statements made by [Noel], defense counsel asked Esther whether, in light of her changed testimony at [Noel's] trial, she was admitting to lying during her testimony at Milton's trial. *Id.* at 638. Esther repeatedly stated that she "doesn't lie," and she maintained that she did not believe that claiming she didn't remember something was the same as lying. *Id.* at 638-39. Defense counsel also confronted Esther with, *inter alia*, the fact that, at Milton's preliminary hearing on May 20, 1999, Esther testified that Milton, not [Noel], told her and her husband on the morning of April 19, 1998 that Milton killed Miriam. *Id.* at 647. Esther responded: "I get nervous that day. I was so nervous all the time I'm nervous. I'm not the same person, okay." *Id.* at 649.

When asked by defense counsel if she lied when she testified at Milton's trial that Detective Comacho had "forced"

_____

[2] Specifically, at Noel's trial, Detective Comacho testified that police had entered information regarding Milton Montalvo's Dodge van into the National Crime Index Computer ("NCIC") system, but erroneously entered the license plate of Miguel Soto's van, a Ford Aerostar. N.T. Trial, 3/18/04, at 199. As a result, when Miguel attempted to obtain the required registration for his van, there was a "pop up NCIC hit" for the homicide involving Milton. *Id.* at 199. Miguel was instructed by PennDot personnel to go to the Lancaster City Police Department, where he was met by Detective Comacho and another officer. Detective Comacho interviewed Miguel, and, upon "figuring out that he had some sort of connection to Milton," asked Miguel "what information . . . he had about the homicide." *Id.* at 200. According to Detective Comacho, Miguel stated that his wife, Esther, "also had information around," and the detective told Miguel he needed to speak with Esther. *Id.* At that point, Detective Comacho drove to Miguel's store, where he took possession of Miguel's van and placed it in the city garage. Detective Comacho reiterated to Miguel at that time that he "needed to talk to Esther." *Id.* at 201. Several days later, Esther went in for an interview with Detective Comacho.

her to change her testimony at [Noel's] trial; that Detective Comacho "forced her to give the statement" that she gave; that the detective told her that if she didn't "say what he said[,] my business would be closed and I would go to jail and I won't see my kids," *id.* at 639-40, Esther responded, "[f]or me that is not lying." *Id.* at 640. When asked if she saw Detective Comacho in the courtroom at [Noel's] trial, Esther identified him, and when asked "is that the detective that forced you to give this statement back in December of 1998?," she replied: "[y]es." *Id.* at 666.

Esther's testimony also conflicted with the testimony given by her husband Miguel Soto, a defense witness. Miguel testified that, in the early morning hours of April 19, 1998, his wife woke him up because someone was knocking at the door. N.T. Trial, 3/18/03, at 245. Miguel answered the door to Milton and [Noel]. *Id.* When asked what, if anything, Milton said to him when he opened the door, Miguel replied, "Milton told me -- I don't want to say this -- that he had killed his wife." *Id.* Miguel testified that Milton did not explain how he killed his wife, but simply stated that "he had problems with the police because he had killed his wife," and that "he had to leave and he wanted to know if he could leave his brother -- and that's when I found out [Noel] was his brother -- could stay at my house." *Id.* Miguel testified that Esther was upstairs when Milton made this statement. *Id.* at 246. After approximately 25 minutes, Miguel told them he did not want any problems and that Esther did not want them staying in the house, so they left. *Id.* at 247. When asked on cross-examination why he did not go to the police, Miguel explained that he intended to go to the police, but Esther convinced him not to do so because it would cause problems. *Id.* at 248-49. Miguel testified that he told Detective Comacho that Milton admitted to killing his wife when Miguel was interviewed by the detective nine months later, in November 1998, when he had problems obtaining the registration for his vehicle. *Id.* at 263.

*Commonwealth v. (Noel) Montalvo*, 114 A.3d 401, 402-06 (Pa. 2015) (internal citations and some footnotes omitted).

In March 2003, more than three years after Milton was convicted of two counts of first-degree murder for the deaths of Miriam and Nelson, a jury convicted Noel of first-

degree murder[3] for the death of Miriam, second-degree murder[4] for the death of Nelson, conspiracy to commit murder,[5] and burglary.[6] At the penalty-phase of trial, the jury found two aggravating circumstances − that Noel killed Miriam during the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6), and that Noel had been convicted of another murder committed either before, or at the time of, the offenses at issue, *id.* § 9711(d)(11).[7] The jury also found two mitigating factors − that Noel had no significant history of prior criminal convictions, *id.* § 9711(e)(1), and that Noel was a good worker, attended church, and was a good son to his mother, *id.* § 9711(e)(8) (the "catch-all" mitigator). Ultimately, the jury determined the aggravating circumstances outweighed the mitigating circumstances, and recommended a sentence of death.

On April 14, 2003, the trial court imposed a sentence of death in connection with Miriam's murder, a sentence of life imprisonment for Nelson's murder, and concurrent terms of 10 to 20 years incarceration each for burglary and conspiracy to commit murder. Noel filed a direct appeal to this Court, during which he was represented by Gerald Anthony Lord, Esquire.[8] On appeal, Noel raised a variety of claims, including claims alleging ineffectiveness of trial counsel. On September 24, 2008, this Court affirmed Noel's judgment of sentence, holding, *inter alia*, that, pursuant to *Commonwealth v.*

---

[3] 18 Pa.C.S. § 2502(a).

[4] *Id.* § 2502(b).

[5] *Id.* § 903(a).

[6] *Id.* § 3502(a).

[7] Noel's conviction for the murder of Nelson was used as an aggravating factor for his death sentence for the murder of Miriam.

[8] On March 22, 2004, prior to sentencing, Mary R. Ennis, Esquire, entered her appearance as counsel for Noel, and Attorney Ennis filed an Amended Concise Statement of Matters Complained of on Appeal on his behalf. Thereafter, Attorney Ennis was granted leave to withdraw as counsel, and, on May 17, 2007, Attorney Lord was appointed to represent Noel.

*Grant*, 813 A.2d 726 (Pa. 2002), his ineffectiveness claims would be deferred to post-conviction proceedings. *Commonwealth v. (Noel) Montalvo*, 956 A.2d 926 (Pa. 2008).

On July 27, 2009, Noel filed a timely *pro se* PCRA petition. Thereafter, Attorney Lord was granted leave to withdraw and Jeffrey Marshall, Esquire, was appointed to represent Noel. Attorney Marshall filed an amended PCRA petition on Noel's behalf on February 1, 2010, and then a supplement to the amended PCRA petition. Between March and September 2011, the PCRA court, by Judge Sheryl Ann Dorney, conducted four days of hearings,[9] and, on January 29, 2013, by opinion and order, Judge Dorney dismissed Noel's amended PCRA petition. Noel appealed to this Court, and subsequently filed a statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b). Judge Dorney issued a Rule 1925(a) opinion rejecting Noel's 15-plus claims raised on appeal, in many instances simply referring to her January 29, 2013 opinion and order.

On August 23, 2013, Noel filed a motion to amend and supplement his Rule 1925(b) statement. As Judge Dorney had retired effective August 1, 2013, the matter was assigned to Judge Michael E. Bortner, who granted Noel's motion to amend. Thereafter, Noel filed an "Amended and Supplemental Statement of Matters Complained of Under [Pa.R.A.P. 1925(b)]". On December 3, 2013, Judge Bortner filed a single-page order denying Appellant PCRA relief, and stating, "[t]his Court defers to the reasoning and decision entered by the Honorable Judge Dorney of the York County Court of Common Pleas on January 29, 2013." PCRA Court Order, 12/3/13. Noel filed an appeal with this Court, raising 16 claims alleging multiple violations of his rights under the United

---

[9] Witnesses who testified at the PCRA hearings included, *inter alia*, Attorney Cutruzzula; Angel Santos; R. Robert Tressel, a crime-scene forensic expert; Detective Comacho; Detective Dennis Williams, who conducted several witness interviews; Detective Daniels; Attorney Ennis; Allen Fuentes, an interpreter who assisted with Detective Williams' interview of Negron; and Attorney Lord.

States and Pennsylvania Constitutions, resulting from both trial court error and ineffectiveness of counsel during the guilt and penalty phases of trial.

This Court, however, determined that deficiencies in the PCRA court's opinion precluded our meaningful appellate review of Noel's claims. Specifically, we noted, *inter alia*, that: despite four days of hearings on Noel's PCRA petition before Judge Dorney, the PCRA court, in its January 29, 2013 opinion and order, addressed the issues set forth in Noel's Pa.R.A.P. 1925(b) statement *filed on direct appeal*; the PCRA court did not discuss Noel's PCRA petition, or the appropriate standard for relief, until the last two pages of its 55-page opinion; and the PCRA court addressed the issues raised in Noel's supplemental 1925(b) statement in a single-page order in which it simply deferred to the trial court's prior opinions, which themselves were insufficient. As a result, we observed that we had no findings of fact, no determinations of credibility, and no legal conclusions regarding Noel's PCRA claims, thus precluding our meaningful appellate review. We further noted that, as there were more than 10 expert, lay, and other witnesses who testified at the PCRA hearings, including those noted above, *see supra* note 9, the lack of any credibility determinations by the PCRA court was particularly problematic.

Accordingly, we vacated the PCRA court's order, and remanded the matter to the PCRA court. Cognizant that Judge Dorney was no longer on the bench, we noted that the matter would need to be assigned to a new judge. Moreover, recognizing that the assigned judge would not have the benefit of having presided over Noel's PCRA hearings, we authorized the newly-assigned judge to conduct additional hearings and admit evidence as necessary for those claims which could not be resolved on the existing record.

On remand, the matter again was assigned to Judge Bortner, who conducted three days of additional PCRA hearings, and, in an 80-page opinion, addressed the issues

raised in Noel's PCRA petition. Ultimately, the PCRA court granted Noel a new penalty-phase trial,[10] as well as a new guilt-phase trial based on trial counsel's ineffectiveness for failing to object to the trial court's error in instructing the jury on the issue of guilt, discussed *infra*. Presently, the Commonwealth appeals the PCRA court's grant of a new guilt-phase trial; it does not, however, challenge the PCRA court's grant of a new penalty-phase trial. In his cross-appeal, Noel challenges the PCRA court's rejection of the additional reasons he relied on for his claim that he is entitled to a new guilt-phase trial.[11]

## II. Analysis

In reviewing the grant or denial of PCRA relief, we examine whether the PCRA court's conclusions are supported by the record and free of legal error. *Commonwealth v. Housman*, 226 A.3d 1249, 1260 (Pa. 2020). Further, we defer to the factual findings

---

[10] The PCRA court concluded Noel was entitled to a new penalty-phase trial based on his establishment of ineffective assistance of counsel in three respects, including the erroneous submission to the jury of the 42 Pa.C.S. § 9711(d)(11) aggravator (the defendant committed another murder before or at the same time as the offense at issue), *see* PCRA Court Opinion, 2/11/19, at 56-57; counsel's failure to investigate and/or prepare mitigation evidence, *see id.* at 57-62; and statements by both counsel and the prosecutor to the jury that its decision on whether to sentence Noel to the death penalty was simply a recommendation. *See id.* at 73-75.

[11] These claims include that the PCRA court erred in denying Noel's claim that trial counsel was ineffective for failing to present the testimony of alibi witness Angel Santos based on a "summary conclusion" that Santos' testimony was not credible and that the absence of Santos' testimony was not prejudicial; that the PCRA court erred in denying his claim that trial counsel was ineffective for failing to present evidence of innocence in the form of forensic expert testimony and finding Noel was not prejudiced by that failure; that the PCRA court erred in denying Noel's claim that trial counsel was ineffective for failing to object to Noel's illegal arrest and to seek suppression of the statements made by Noel following his arrest; that the PCRA court erred in denying his claim that trial counsel was ineffective for failing to object to the jury selection procedure of York County, which he alleges systematically excludes minorities; that the PCRA court erred in denying Noel's claim that trial counsel was ineffective for failing to object to numerous instances of prosecutorial misconduct, denying him a fair trial; and that the PCRA court erred in denying Noel's claim that trial counsel was ineffective for failing to object to the trial court's jury instructions regarding reasonable doubt.

of a post-conviction court, which hears evidence and passes on the credibility of witnesses. *Id.*

In order to qualify for relief under the PCRA, the petitioner must establish, by a preponderance of the evidence, that his conviction or sentence resulted from one or more of the enumerated errors in 42 Pa.C.S. § 9543(a)(2). These errors include, *inter alia*, a violation of the Pennsylvania or United States Constitutions, or instances of ineffectiveness of counsel that "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." *Id.* § 9543(a)(2)(i) and (ii); *Housman*, 226 A.3d at 1260. The petitioner also must establish that his claims have not been previously litigated or waived. 42 Pa.C.S. § 9543(a)(3). An issue is previously litigated if "the highest appellate court in which [the appellant] could have had review as a matter of right has ruled on the merits of the issue." *Id.* § 9544(a)(2). An issue is waived if appellant "could have raised it but failed to do so before trial, at trial, . . . on appeal or in a prior state postconviction proceeding." *Id.* § 9544(b).

In order to obtain relief on a claim of ineffectiveness of counsel, a PCRA petitioner must satisfy the performance and prejudice test set forth in *Strickland v. Washington,* 466 U.S. 668 (1984). In Pennsylvania, we have applied the *Strickland* test by requiring that a petitioner establish that (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's action or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability that the result of the proceeding would have been different. *Commonwealth v. Pierce*, 786 A.2d 203, 213 (Pa. 2001). Counsel is presumed to have rendered effective assistance, and, if a claim fails under any required element of the *Strickland* test, the court may dismiss the claim on that basis. *Housman*, 226 A.3d at 1260-61. With these standards in mind, we turn to the Commonwealth's claim that the PCRA court erred in

granting Noel a new guilt-phase trial, based on its determination that trial counsel was ineffective for failing to object to the trial court's error in instructing the jury on the Commonwealth's burden of proof with respect to his guilt.

Preliminarily, it is well established that, in reviewing a challenge to jury instructions, an appellate court must consider the charge in its entirety, rather than discrete portions of the instruction. *Commonwealth v. Frein*, 206 A.2d 1049, 1077 (Pa. 2019). Further, a trial court is free to use its own expressions of the law, so long as the concepts at issue are clearly and accurately presented to the jury. *Id.* The trial transcript in this case reveals that the trial court provided the following instruction to the jury regarding the Commonwealth's burden of proof:

> Although the Commonwealth has the burden of proving that the Defendant is guilty, and this burden is beyond a reasonable doubt, this does not mean that the Commonwealth must prove its case beyond all doubt and to a mathematical certainty, nor must it demonstrate the complete impossibility of innocence. A reasonable doubt is a doubt that would cause a reasonably sensible person to pause or hesitate before acting upon a matter of importance in his or her own affairs.
>
> A reasonable doubt must fairly arise out of the evidence that was presented or lack of evidence presented with respect to some element of the crime. A reasonable doubt must be a real doubt; it may not be an imagined one, nor may it be a doubt manufactured to avoid carrying out what would otherwise be an unpleasant duty.
>
> In further explanation of reasonable doubt, let me give you a sample. Three years ago I wanted to go and look for a farm because I wanted to raise dogs. I found a great farm, nine acres and I said, that's great for my dogs to run on. I wanted to go and check this farm out.
>
> And when I went into the basement of the farm -- of the farm house, I saw that there was damage to the walls. And me being the daughter of a home builder, I knew right away that the basement had substantial leaks of some sort of

substance and I didn't think that it was water because it was kind of an oily substance that came from the walls, it was an old stone wall.

And when I looked at that, I had a reasonable doubt that caused me to pause and hesitate before acting upon a matter of importance in my own affairs, the buying of the house. As it turned out, I didn't buy that house. Why didn't I buy that house? Because I had a reasonable doubt.

*So if the Commonwealth has not sustained it's (sic) burden to that level, the burden of proving the Defendant guilty beyond a reasonable doubt, then your verdict must be guilty.* If, in fact, that you find that the Commonwealth has proven its case beyond a reasonable doubt, then your verdict should be guilty.

So to summarize, you may not find the Defendant guilty based on a mere suspicion of guilt. The Commonwealth has the burden of proving the Defendant guilty beyond a reasonable doubt. If it meets that burden, then the Defendant does (sic) no longer presumed innocent and you should find him guilty. On the other hand, if the Commonwealth does not meet its burden, then you must find the Defendant not guilty.

N.T. Trial, 3/19/03, at 5-7 (Commonwealth's Reproduced Record ("R.R.") at 42a-44a) (emphasis added). It is indisputable that the portion of the jury instructions italicized above was incorrect, as a jury may not find a defendant guilty if the Commonwealth fails to meet its burden of proving the defendant's guilt beyond a reasonable doubt.

In addressing Noel's claim that he is entitled to PCRA relief based on this erroneous jury instruction, the PCRA court first opined that the above statement "was clearly a simple example of a jurist misspeaking during the lengthy process of instructing the jury." PCRA Court Opinion, 2/11/19, at 49. Nevertheless, the PCRA court noted that trial counsel testified during the PCRA hearings that he did not object to the erroneous statement by the trial court because "he did not recognize the mistake." *Id.* The PCRA court concluded that, had counsel requested a curative instruction from the trial court, it was "quite sure that this request would or should have been granted." *Id.* at 50. Thus,

the PCRA court found that Noel established the first and second prongs of his ineffectiveness claim − that the underlying claim had arguable merit, and that there was no reasonable basis for trial counsel's failure to act. Turning to the third prong – prejudice – the PCRA court, recognizing that it was required to review jury instructions as a whole, concluded that the requirement of proof of guilt beyond a reasonable doubt is "the bedrock of our criminal law," and the trial court's erroneous instruction was a "basic and fundamental error" that could not be corrected except by a new guilt-phase trial. *Id.*

The Commonwealth contends that the PCRA court erred in concluding that trial counsel was ineffective for failing to object to and/or request a curative instruction with respect to "one isolated misstatement that occurred during the course of otherwise error-free instructions to the jury." Commonwealth's Brief at 30. Initially, the Commonwealth submits that it is "unknown" whether the trial court actually misspoke when instructing the jury, or "whether the court reporter made a typographical error." *Id.*

The Commonwealth further emphasizes that, during the trial court's individual *voir dire* of the jurors, the trial judge "explained the burden of the prosecution and made diligent inquiry as to whether the jurors could return a verdict of 'not guilty' if so warranted." *Id.* at 32. Thus, according to the Commonwealth, the "one inaccurate statement" in the above-quoted jury instruction was "overshadowed by proper and adequate pronouncements on the burden of proof before and after the inaccurate statement appears." *Id.*

The Commonwealth additionally suggests that "the fact that the jury cannot convict someone if the Commonwealth does not prove their guilt beyond a reasonable doubt is a very basic legal tenet that is mostly familiar to everyone," and "it strains credulity to believe that a juror would convict [Noel] if the Commonwealth failed to prove his guilt." *Id.* at 35.

The Commonwealth also asserts that "[t]his was not a case where [the trial court] expressed improper opinions on the evidence or credibility of the witnesses." *Id.*

Upon review, we are unpersuaded by the Commonwealth's arguments. First, with respect to the Commonwealth's novel suggestion that the erroneous statement by the trial court may not actually have been a misstatement, but a typographical error by the court reporter, had the Commonwealth genuinely believed that the stenographer made a typographical error in transcribing the record, it could have utilized the procedures provided by our Rules of Criminal and Appellate Procedure for the correction of such errors. *See* Pa.R.Crim.P 115 (c) (at any time before an appeal is taken, the court may correct or modify the record in the same manner as provided by Rule 1926 of the Pennsylvania Rules of Appellate Procedure); Pa.R.A.P. 1926 ("If any difference arises as to whether the record truly discloses what occurred in the trial court, the difference shall be submitted to and settled by that court after notice to the parties and opportunity for objection, and the record made to conform to the truth."). As the Commonwealth did not avail itself of this procedure, we reject its eleventh-hour assertion that the transcript may be incorrect.

We also reject the Commonwealth's argument that the legal principle that, in order to be convicted of a crime, an individual must be proven guilty beyond a reasonable doubt is "mostly familiar to everyone," Commonwealth's Brief at 35, and that the jury would not have convicted Noel had it not believed he was guilty beyond a reasonable doubt. As we previously have explained:

> It is an axiomatic principle of our jurisprudence that the trial judge has the sole responsibility for instructing the jury on the law as it pertains to the case before them. "The function of elucidating the relevant legal principles belongs to the judge, and the failure to fulfill this function deprives the defendant of a fair trial."

*Commonwealth v. Bricker*, 581 A.2d 147, 153 (Pa. 1990) (citation omitted). Thus, a jury member's prior or extraneous knowledge regarding critical legal precepts is irrelevant.

Finally, we disagree with the Commonwealth's suggestion that the trial judge's individual *voir dire* of the jurors, during which she "properly advised the jury that the Commonwealth bore the burden of proving [Noel's] guilt beyond a reasonable doubt and that a verdict of 'not guilty' was required if this burden was not met," sufficiently and properly instructed the jury as to the Commonwealth's burden of proof. Commonwealth's Brief at 32. As this Court has explained,

> [t]he purpose of *voir dire* is solely to ensure the empanelling of a competent, fair, impartial, and unprejudiced jury capable of following the instructions of the trial court. Neither counsel for the defendant nor the Commonwealth should be permitted to ask direct or hypothetical questions designed to disclose what a juror's present impression or opinion as to what his decision will likely be under certain facts which may be developed in the trial of the case.

*Commonwealth v. Bomar,* 826 A.2d 831, 849 (Pa. 2003). In other words, the purpose of *voir dire* is to ascertain *whether a juror is capable of following the instructions of the trial court*. We cannot agree that questions posed by a trial court to *potential* members of a jury during *voir dire*, which takes place well before the presentation of any evidence in a case and before the selected jury retires to deliberate, could be considered a sufficient and proper jury instruction as to burden of proof. Thus, to determine whether the PCRA court erred in awarding Noel a new trial on the basis of trial counsel's failure to object to the trial court's erroneous jury instructions, we turn our focus to those actual instructions.

As noted above, the Commonwealth repeatedly contends that "one inaccurate statement" by the trial court regarding the Commonwealth's burden of proof was "overshadowed by proper and adequate pronouncements on the burden of proof before and after the inaccurate statement appears." Commonwealth's Brief at 32. Notably,

however, the trial transcript reveals that, shortly after the trial court gave the erroneous jury instruction to which counsel failed to object, the trial court gave a *second* erroneous jury instruction:

> **Trial Court:** This is the verdict form that will be completed by the foreman and brought back into the courtroom, once you've reached a verdict. It helps you understand what the charges are.
>
> As I indicated, burglary and criminal conspiracy to commit criminal homicide only apply to Miriam Ascencio. There are also charges of first degree murder and second degree murder as I defined those for Miriam Ascencio and first degree murder and second degree murder arising out of the death of Manual Santana/Nelson Lugo.
>
> Go down each one of those, don't jump down and keep it in chronological order. And I want to say simply, I don't want you do (sic) to take this lightly, and keep it organized for you. And as I said, *if you find that the Defendant was not involved in this, you should find him guilty of all those charges.*
>
> **Attorney Cutruzzula:** Not guilty, Judge.
>
> **Trial Court:** Not guilty. *Now that was a Freudian slip.* Not guilty of all of those charges, if you find that he was not involved in this, first degree murder, as I described it to you. If you find that the Defendant not guilty of first degree murder involving both of (sic) death Miriam Ascencio and Manuel Santana, either a principal or a person who committed the murder or an accomplice of Milton Montalvo, then go down to the second degree murder and consider that. I want you to mark if you find not guilty and mark not guilty and consider second degree murder.

N.T. Trial, 3/19/03, at 31-32 (R.R. at 50a-51a) (emphasis added).

Notwithstanding the fact that the Commonwealth, in maintaining there was only one erroneous instruction in this vein, has, for the most part, ignored this second misstatement, the Commonwealth now posits that the fact that trial counsel corrected the trial court following this second erroneous instruction supports its theory that the trial court's initial "misstatement," to which counsel did not object, "may have been a

typographical error." Commonwealth's Brief at 34. We have already rejected the Commonwealth's reliance on the theory that there was a typographical error in the transcript.

Furthermore, we conclude that the trial court's second erroneous instruction to the jury, and the trial judge's purported correction of the misstatement when brought to its attention by trial counsel, could only have served to prejudice Noel even further. In *Commonwealth v. Archambault*, this Court held that a trial judge may not express an opinion on the guilt or innocence of the defendant. 290 A.2d 72, 75 (Pa. 1972). We explained:

> An expression by the judge that in his opinion the accused is guilty leaves an indelible imprint on the minds of the jury. The jury is undoubtedly going to attribute to the judge, because of his experience in criminal cases, special expertise in determining guilt or innocence. As Mr. Justice (later Chief Justice) Kephart stated for this Court:
>
> > 'The judge occupies an exalted and dignified position; he is the one person to whom the jury, with rare exceptions, looks for guidance, and from whom the litigants expect absolute impartiality. An expression indicative of favor or condemnation is quickly reflected in the jury box . . . . To depart from the clear line of duty through questions, expressions, or conduct, contravenes the orderly administration of justice. It has a tendency to take from one of the parties the right to a fair and impartial trial, as guaranteed under our system of jurisprudence.'

*Id.* (citation omitted).

We further echoed the United States Supreme Court's observation in *Bollenbach v. United States*, 326 U.S. 607 (1946), that "[t]he influence of the trial judge on the jury is necessarily and properly of great weight,' . . . and jurors are ever watchful of the words

that fall from him. Particularly in a criminal trial, the judge's last word is apt to be the decisive word.'" *Archambault*, 290 A.2d at 75 (quoting *Bollenbach*, 326 U.S. at 612).

As noted above, when the trial court erroneously instructed the jury − for the second time − that, if it found that Noel was **not** involved in the murders, it should find him guilty, trial counsel corrected the court by stating "Not guilty, Judge." The trial judge immediately commented, "Now that was a Freudian slip," before providing a correct instruction. A "Freudian slip," also called parapraxis, is defined as a "slip of the tongue that is motivated by and reveals some unconscious aspect of the mind." *Merriam-Webster.com Dictionary*, Merriam-Webster, available at https://www.merriam-webster.com/dictionary/Freudian%20slip. The reference dates back to the research of Sigmund Freud, the founder of psychoanalysis, and is commonly understood to mean an unintended statement that reveals the true feelings of the speaker. In characterizing her own erroneous instruction to the jury as a "Freudian slip," the trial judge conveyed to the jury her belief that Noel was guilty.

In concluding that Noel established the prejudice prong of his ineffectiveness claim, the PCRA court did not expressly rely on the trial court's second misstatement of the law, or the trial judge's "Freudian slip" comment; it found that the trial court's initial uncorrected misstatement of the law constituted a "basic and fundamental error" requiring the award of a new guilt-phase trial. PCRA Court Opinion, 2/11/19, at 50. Regardless of that finding, we conclude that the trial court's second misstatement of the law, and her reference to a "Freudian slip" when attempting to correct that misstatement, fully supports the PCRA court's finding that Noel is entitled to relief. The effect of the trial judge's attempted correction was two-fold. First, the judge's characterization of her misstatement of the law as a "Freudian slip" unmistakably constituted an expression of her opinion on

Noel's guilt, in violation of the central tenet, discussed above, that a judge must be resolutely impartial.

Second, the trial judge's use of the term "Freudian slip" when attempting to correct her misstatement of the law actually *undermined* the correction, as it made light of her two prior misstatements of the law, and implied that the prior misstatements were not simply innocent slips of the tongue that the jury should disregard. The trial judge's flippant attempt at a correction of her prior misstatements could only have compounded any misunderstanding the jury may have had regarding the proper standard of proof and its application to Noel. We thus find that the record supports the PCRA court's conclusion that Noel was prejudiced by counsel's ineffectiveness.

For these reasons, we agree with the PCRA court that Noel established all three prongs of his ineffectiveness claim, and, therefore, that a new guilt-phase trial is required. In light of this conclusion, we need not address the issues raised by Noel in his cross-appeal.

Order affirmed.

Chief Justice Saylor and Justices Baer, Donohue, Dougherty, Wecht and Mundy join the opinion.